Filed 3/2/15

# IN THE SUPREME COURT OF CALIFORNIA

| | | |
|---|---|---|
| BERKELEY HILLSIDE PRESERVATION et al. | ) ) ) | |
| Plaintiffs and Appellants, | ) ) ) | S201116 |
| v. | ) ) | Ct.App. 1/4 A131254 |
| CITY OF BERKELEY et al., | ) ) | Alameda County |
| Defendants and Respondents; | ) ) | Super. Ct. No. RG10517314 |
| DONN LOGAN et al., | ) ) | |
| Real Parties in Interest and Respondents. | ) ) ) | |
| _____ | ) | |

The California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq.)[1] establishes a comprehensive scheme to provide long-term protection to the environment.  It prescribes review procedures a public agency must follow before approving or carrying out certain projects.  For policy reasons, the Legislature has expressly exempted several categories of projects from review under CEQA.  (See § 21080, subd. (b)(1) – (15).)  By statute, the Legislature has also directed the Secretary of the Natural Resources Agency (Secretary) to establish "a list of classes of projects that have been determined not to have a significant effect on the environment and that shall be exempt from" CEQA.

---

[1]     All further unlabeled statutory references are to the Public Resources Code.

(§ 21084, subd. (a).) "In response to that mandate," the Secretary "has found" that certain "classes of projects . . . do not have a significant effect on the environment" and, in administrative regulations known as guidelines, has listed those classes and "declared [them] to be categorically exempt from the requirement for the preparation of environmental documents." (Cal. Code Regs., tit. 14, § 15300; see *id*., § 15000 et seq., Guidelines for Implementation of CEQA (Guidelines).) Respondent City of Berkeley (City), in approving a permit application to build a 6,478-square-foot house with an attached 3,394-square-foot 10-car garage, relied on two of the class exemptions the Secretary has established pursuant to the Legislature's mandate: (1) "Class 3," which comprises the construction of "new, small facilities or structures," including "[o]ne single-family residence, or a second dwelling unit in a residential zone" (Guidelines, § 15303); and (2) "Class 32," which comprises "in-fill development" projects, i.e., projects that "occur[] within city limits on a project site of no more than five acres substantially surrounded by urban uses" and that meet other specified conditions (Guidelines, § 15332).

The Court of Appeal invalidated the permit approval, relying on Guidelines section 15300.2, subdivision (c), which provides: "A categorical exemption shall not be used for an activity where there is a reasonable possibility that the activity will have a significant effect on the environment due to unusual circumstances." In the Court of Appeal's view, that a proposed activity may have a significant effect on the environment is itself an unusual circumstance that renders the categorical exemptions inapplicable. Finding substantial evidence of a fair argument that the proposed project may have a significant environmental impact, the court held that the exemptions the City invoked do not apply, and it ordered the trial court to issue a writ of mandate directing the City to set aside the permit

2

approvals and its finding of a categorical exemption, and to order preparation of an environmental impact report (EIR).

We granted review to consider the proper interpretation and application of Guidelines section 15300.2, subdivision (c). We reverse the Court of Appeal's decision.

## I. FACTUAL BACKGROUND

Real parties in interest and respondents Mitchell Kapor and Freada Kapor-Klein (applicants) want to build a large house on their lot on Rose Street in Berkeley. The lot is on a steep slope (approximately 50 percent grade) in a heavily wooded area. In May 2009, their architect applied to the City for a use permit to demolish the existing house on the lot and to build a 6,478-square-foot house with an attached 3,394-square-foot 10-car garage. The residence would be built on two floors, would include an open-air lower level, and would cover about 16 percent of the lot.

In January 2010, the City's zoning adjustments board (Board), after holding a public hearing and receiving comments about the project, approved the use permit. It found the project exempt from CEQA review under Guidelines sections 15303, subdivision (a), and 15332. The former, which the Secretary has designated Class 3, includes "construction and location of limited numbers of new, small facilities or structures," including "[o]ne single-family residence, or a second dwelling unit in a residential zone," and "up to three single-family residences" "[i]n urbanized areas." (Guidelines, § 15303, subd. (a).) The latter, which the Secretary has designated Class 32, applies to a project "characterized as in-fill development" meeting the following conditions: (1) it "is consistent with the applicable general plan designation and all applicable general plan policies as well as with applicable zoning designation and regulations"; (2) it "occurs within city limits on a project site of no more than five acres substantially surrounded by urban uses"; (3) its "site has no value[] as habitat for endangered, rare or

3

threatened species" and "can be adequately served by all required utilities and public services"; and (4) its approval "would not result in any significant effects relating to traffic, noise, air quality, or water quality." (Guidelines, § 15332.) The Board also found that Guidelines section 15300.2, subdivision (c), does not preclude use of these categorical exemptions because the project as proposed and approved will not have any significant effects on the environment due to unusual circumstances.

Several residents of the City, including appellant Susan Nunes Fadley, filed an appeal with the city council, arguing in part that CEQA's categorical exemptions do not apply because the proposed project's "unusual size, location, nature and scope will have significant environmental impact on its surroundings." They asserted that the proposed residence would be "one of the largest houses in Berkeley, four times the average house size in its vicinity, and situated in a canyon where the existing houses are of a much smaller scale." They submitted evidence that, of Berkeley's over 17,000 single-family residences, only 17 exceed 6,000 square feet, only 10 exceed 6,400 square feet, and only one exceeds 9,000 square feet. They also asserted that the proposed residence would exceed the maximum allowable height under Berkeley's municipal code and would be inconsistent with the policies of the City's general plan, and that an EIR is appropriate to evaluate the proposed construction's potential impact on noise, air quality, historic resources, and neighborhood safety. In response, the City's director of planning and development stated that 16 residences within 300 feet of the project have a greater floor-area-to-lot-area ratio and that 68 Berkeley "dwellings" exceed 6,000 square feet, nine exceed 9,000 square feet, and five exceed 10,000 square feet.

The city council received numerous letters and e-mails regarding the appeal, some in support and some in opposition. Among the appeal's supporters was Lawrence Karp, an architect and geotechnical engineer. In a letter dated April 16, 2010, Karp stated: (1) he had reviewed the architectural plans and topographical survey filed with the Board, and had visited the proposed

4

construction site; (2) "[p]ortions of the major fill for the project are shown to be placed on an existing slope inclined at about 42º (~1.1h:1v) to create a new slope more than 50º (~0.8h:1v)"; (3) "[t]hese slopes cannot be constructed by earthwork and all fill must be benched and keyed into the slope which is not shown in the sections or accounted for in the earthwork quantities.  To accomplish elevations shown on the architectural plans, shoring and major retaining walls not shown will have to be constructed resulting in much larger earthwork quantities than now expected"; (4) the "massive grading" necessary would involve "extensive trucking operations"; (5) the work that would be necessary "has never before been accomplished in the greater area of the project outside of reservoirs or construction on the University of California campus and Tilden Park"; (6) the project site is "located alongside the major trace of the Hayward fault and it is mapped within a state designated earthquake-induced landslide hazard zone"; and (7) "the project as proposed is likely to have very significant environmental impacts not only during construction but in service due to the probability of seismic lurching of the oversteepened side-hill fills."

In a second letter addressing the investigation of geotechnical engineer Alan Kropp, Karp stated:  (1) no "fill slopes" were shown in Kropp's plan and "the recommendations for retaining walls do not include lateral earth pressures for slopes with inclinations of more than 2h:1v (~27º) or for wall heights more than 12 feet"; (2) the project's architectural plans "include cross-sections and elevations that are inconsistent with the Site Plan and limitations in" Kropp's report; (3) "all vegetation will have to be removed for grading, and retaining walls totaling 27 feet in height will be necessary to achieve grades.  Vertical cuts for grading and retaining walls will total about 43 feet (17 feet for bench cutting and 26 feet for wall cutting).  [¶] A drawing in the [Kropp] report depicts site drainage to be collected and discharged into an energy dissipater dug into the slope, which is inconsistent with the intended very steep fill slopes"; and (4) "the project as proposed is likely to have very significant environmental impacts not only during

5

construction, but in service due to the probability of seismic lurching of the oversteepened side-hill fills."

In response, Kropp stated that the project site is in an area where an investigation is required to evaluate the potential for landslides, and that he had conducted the necessary investigation and found there is, in fact, no landslide hazard. Kropp also stated that, in raising concerns about "side-hill fill," Karp had "misread[]" the project plans. According to Kropp, "the only fill placed by the downhill portion of the home will be backfill for backyard retaining walls and there will be no side-hill fill placed for the project. The current ground surface, along with the vegetation, will be maintained on the downhill portion of the lot." Because there will not, as Karp claimed, be any "steep, side-hill fill constructed," Karp's concerns do not apply to the proposed construction. A civil engineer, Jim Toby, also submitted a letter stating that he saw "no evidence" in the project plans that fill will be placed " 'directly on steep slopes' " and that Karp's contrary assertion is based on a "misreading" of the plans.

In support of the permit approval, the City's director of planning and development submitted a supplemental report stating: "A geotechnical report was prepared and signed by a licensed Geotechnical Engineer and a Certified Engineering Geologist. This report concluded that the site was suitable for the proposed dwelling from a geotechnical standpoint and that no landslide risk was present at the site. Should this project proceed, the design of the dwelling will require site-specific engineering to obtain a building permit."

The city council addressed the appeal at a meeting on April 27, 2010. Karp was one of the speakers at the meeting. He began by stating his credentials, explaining that he (1) is "a geotechnical engineer specializing in foundation engineering and construction"; (2) has "an earned doctorate degree in civil engineering and other degrees from U.C. Berkeley including two masters and a post-doctoral certificate in earthquake engineering"; (3) is "fully licensed" and had "taught foundational engineering at Berkeley for 14 years and at Stanford for

6

three"; (4) has "experience" that "includes over 50 years of design and construction in Berkeley"; and (5) "prepare[s] feasibility studies before, and engineering during, construction of unusual projects." After affirming the opinion he had earlier stated in his letters, he offered this response to the assertion that he had misread the project plans: "The recent report from [applicants] say I don't know how to read architectural drawings, but I have been a licensed architect for many years and I do know how. [¶] Their reports have not changed my opinion." After hearing from Karp, Kropp, and others, the city council adopted the Board's findings, affirmed the permit approval, and dismissed the appeal. The city planning department later filed a notice of exemption, stating that the project is categorically exempt from CEQA under Guidelines sections 15303, subdivision (a), and 15332, and that Guidelines section 15300.2 did not apply.

Fadley then filed a petition for writ of mandate in the trial court, joined by appellant Berkeley Hillside Preservation, which is a self-described unincorporated association of "City residents and concerned citizens who enjoy and appreciate the Berkeley hills and their environs and desire to protect the City's historic, cultural, architectural, and natural resources." Following a hearing, the trial court denied the petition. It first concluded that the administrative record contains substantial evidence to support the City's application of the Class 32 in-fill and Class 3 small structures categorical exemptions. It next found that Guidelines section 15300.2, subdivision (c), did not preclude application of these categorical exemptions because, notwithstanding evidence of potentially significant environmental effects, the proposed project does not present any unusual circumstances.

The Court of Appeal reversed. After noting appellants' concession, for purposes of appeal, that the project satisfies the requirements of the Class 3 and Class 32 exemptions, the Court of Appeal agreed with appellants that the unusual circumstances exception precludes the City from relying on those exemptions.[2] In

_____

[2]    The concurring opinion prefers to call section 15300.2, subdivision (c), "the significant effect exception," based on its title. (Conc. opn. of Liu, J., *post*, at p.

7

the court's view, "the fact that proposed activity may have an effect on the environment is *itself* an unusual circumstance" that triggers the exception, "because such action would not fall 'within a class of activities that does not normally threaten the environment,' and thus should be subject to further environmental review." The court next reasoned that the standard of judicial review for an agency's determination that the exception does not apply is whether the record contains evidence of a fair argument of a significant effect on the environment, not whether substantial evidence supports the agency's determination. Finally, finding substantial evidence of a fair argument that the proposed project may have a significant environmental impact, the court held that the unusual circumstances exception renders the categorical exemptions inapplicable. It ordered the trial court "to issue a writ of mandate directing the City to set aside the approval of use permits and its finding of a categorical exemption, and to order the preparation of an EIR."

We then granted respondents' petition for review.

## II. DISCUSSION

As they did in the Court of Appeal, appellants concede for purposes of this appeal that the proposed project comes within the terms of the Class 3 (small structures) and Class 32 (in-fill development) exemptions under the Guidelines. What they do not concede is that the City may rely on those exemptions. In their view, as the Court of Appeal held, the unusual circumstances exception precludes such reliance. Respondents, in challenging the Court of Appeal's decision, raise

---

6.) Our use of the term "unusual circumstances exception" is consistent with the Court of Appeal's decision in this case and the vast majority of published case law. Of course, a provision's title "is never allowed to enlarge or control the language in the body of the [provision]." (*Hagar v. Sup. of Yolo Co.* (1874) 47 Cal. 222, 232; see *DaFonte v. Up-Right, Inc.* (1992) 2 Cal.4th 593, 602 ["Title or chapter headings are unofficial and do not alter the explicit scope, meaning, or intent of a statute."].)

two primary arguments: (1) a proposed project's potential significant effect on the environment is not, as the Court of Appeal held, itself an unusual circumstance that triggers the exception, and an unusual circumstance apart from the project's potential environmental effect is a prerequisite to the exception's application; and (2) in reviewing the City's conclusion that the exception is inapplicable, the Court of Appeal should have determined whether there was substantial evidence in the record to support that conclusion, not whether the record contains evidence of a fair argument of a significant effect on the environment. To these arguments, we now turn.

### A. *A Potentially Significant Environmental Effect Is Not Alone Sufficient to Trigger the Unusual Circumstances Exception.*

Generally, the rules that govern interpretation of statutes also govern interpretation of administrative regulations. (*Guzman v. County of Monterey* (2009) 46 Cal.4th 887, 898; *Cal. Drive-in Restaurant Assn. v. Clark* (1943) 22 Cal.2d 287, 292.) Thus, we begin here with the language of the unusual circumstances exception, giving effect to its usual meaning and avoiding interpretations that render any language surplusage. (*Brewer v. Patel* (1993) 20 Cal.App.4th 1017, 1021.) As noted earlier, Guidelines section 15300.2, subdivision (c), provides: "A categorical exemption shall not be used for an activity where there is a reasonable possibility that the activity will have a significant effect on the environment due to unusual circumstances." The plain language of this provision supports the view that, for the exception to apply, it is not alone enough that there is a reasonable possibility the project will have a significant environmental effect; instead, in the words of the Guideline, there must be "a reasonable possibility that the activity will have a significant effect on the environment *due to unusual circumstances*." (Guidelines, § 15300.2, subd. (c), italics added.)

Contrary to our rules for interpreting regulations, appellants' proposed construction, which mirrors that of the Court of Appeal and which the concurring opinion would adopt, would give no meaning to the phrase "due to unusual circumstances." According to appellants, this phrase is merely "descriptive" in that "[u]nusual circumstances" are simply "self-evident underpinnings" when a project that otherwise satisfies the requirements of a categorical exemption nevertheless "has potentially significant impacts." Likewise, the concurring opinion asserts that "the phrase 'unusual circumstances' . . . simply *describes* the nature of a project that, while belonging to a class of projects that typically have no significant environmental effects, nonetheless will have such effects." (Conc. opn, *post*, at p. 2.) In other words, in the view of appellants and the concurring opinion, the phrase "due to unusual circumstances" adds nothing to the meaning of the regulation, and the exception applies if there is a fair argument that a project "may" (according to appellants) or "will" (according to the concurring opinion (*ibid*.)) have a significant environmental effect. However, had that been the Secretary's intent, the phrase "due to unusual circumstances" would, no doubt, have been omitted from the regulation; rather than confuse the issue with meaningless language, the regulation would clearly and simply provide that the exception applies "if there is a reasonable possibility that the activity will have a significant effect on the environment." Reading the phrase "due to unusual circumstances" out of the regulation, as appellants and the concurring opinion propose, would be contrary to the principle of construction that directs us "to accord meaning to every word and phrase in a regulation." (*Price v. Starbucks Corp.* (2011) 192 Cal.App.4th 1136, 1145.)

In addition, we agree with respondents that, under the construction of appellants and the concurring opinion, the categorical exemptions the Legislature, through the Secretary, has established would have little, if any, effect. CEQA

10

specifies that environmental review through preparation of an EIR is required only "[i]f there is substantial evidence . . . that the project may have a significant effect on the environment." (§ 21080, subd. (d).) As a corollary to this principle, CEQA also specifies that, if "[t]here is no substantial evidence, in light of the whole record before the lead agency, that the project may have a significant effect on the environment," then the proposed project is not subject to further CEQA review. (§ 21080, subd. (c)(1).) Guidelines section 15061, subdivision (b)(3), captures these principles by specifying: "Where it can be seen with certainty that there is no possibility that the activity in question may have a significant effect on the environment, the activity is not subject to CEQA."

Under these provisions, where there is no substantial evidence a proposed project may have a significant environmental effect, further CEQA review is unnecessary; no categorical exemption is necessary to establish that proposition. According to appellants, under the unusual circumstances exception, the categorical exemptions are inapplicable unless an agency "check[s] its files" and finds no "evidence of potentially significant impacts." But this is precisely the inquiry an agency makes under Guidelines section 15061, subdivision (b)(3), to determine whether the proposed project is subject to CEQA review in the first instance. (*Muzzy Ranch Co. v. Solano County Airport Land Use Com.* (2007) 41 Cal.4th 372, 387 (*Muzzy Ranch*) [under Guidelines, § 15061, subd. (b)(3), agency must determine whether the evidence in the administrative record shows no possibility the proposed activity may have a significant effect on the environment].) And appellants' test for determining whether the unusual circumstances exception applies —whether there is a "reasonable possibility" the proposed project "will have a significant effect on the environment" (Guidelines, § 15300.2, subd. (c)) — is precisely the test used to determine whether Guidelines section 15061, subdivision (b)(3), applies. (*California Farm Bureau Federation v.*

11

*California Wildlife Conservation Bd.* (2006) 143 Cal.App.4th 173, 194 [Guidelines, § 15061, subd. (b)(3), inapplicable if "there *is* a reasonable possibility that a proposed project will have a significant effect upon the environment"].) Thus, under appellants' view, the categorical exemptions would serve no purpose; they would apply only when the proposed project is, by statute and Guidelines section 15061, subdivision (b)(3), already outside of CEQA review.

Appellants assert that applying a categorical exemption despite a proposed project's potential significant environmental effect would contravene CEQA statutes and the Legislature's intent in passing CEQA. They rely on three CEQA provisions: (1) section 21100, subdivision (a), which directs preparation of an EIR "on any project . . . that may have a significant effect on the environment"; (2) section 21151, which similarly directs preparation of an EIR "on any project . . . which may have a significant effect on the environment"; and (3) section 21082.2, subdivision (d), which states that an EIR "shall" be prepared "[i]f there is substantial evidence, in light of the whole record before the lead agency, that a project may have a significant effect on the environment." This statutory authority, appellants assert, "does not allow categorical exemptions for any project that *may have a significant effect on the environment.*" In other words, "the documented presence of a potential environmental effect . . . always defeat[s] a categorical exemption." "[T]he statutory authority [the Legislature] has given to the Secretary *only* allows categorical exemption for projects that have no significant environmental effect, and 'no statutory policy exists in favor of applying categorical exemptions where a fair argument can be made that a project will create a significant effect on the environment.' " Thus, appellants assert, requiring more than a showing that a proposed project may have a significant effect in the environment "would be inconsistent with" CEQA's statutory "mandates."

Appellants' argument ignores a basic principle of statutory interpretation: courts "do not construe statutes in isolation, but rather read every statute 'with reference to the entire scheme of law of which it is part so that the whole may be harmonized and retain effectiveness.' " (*People v. Pieters* (1991) 52 Cal.3d 894, 899.) Thus, we must consider the three sections appellants cite, not in isolation, but " 'in the context of the statutory framework as a whole' " in order to harmonize CEQA's " 'various parts.' " (*Palos Verdes Faculty Assn. v. Palos Verdes Peninsula Unified Sch. Dist.* (1978) 21 Cal.3d 650, 659 [construing the Ed. Code].)

Here, several CEQA provisions, as well as their evolution, are relevant to the issue. When the Legislature enacted CEQA in 1970, it directed the Governor's Office of Planning and Research (OPR), "in conjunction with appropriate state, regional, and local agencies," to "coordinate the development of objectives, criteria, and procedures to assure the orderly preparation and evaluation of" EIRs. (Former § 21103, added by Stats. 1970, ch. 1433, § 1, pp. 2780, 2782.) Two years later, in *Friends of Mammoth v. Board of Supervisors* (1972) 8 Cal.3d 247, 259 (*Mammoth*), we held that CEQA applies, not just to public projects, but also to private activities requiring a government permit or similar entitlement. Before *Mammoth*, it had been "generally believed" that CEQA "appl[ied] only to projects undertaken or funded by public agencies." (*Friends of Lake Arrowhead v. Board of Supervisors* (1974) 38 Cal.App.3d 497, 513.) Cognizant of our decision's potential ramifications, after recognizing that "the reach of the statutory phrase, 'significant effect on the environment,' is not immediately clear," we noted: "To some extent this is inevitable in a statute which deals, as the [CEQA] must, with *questions of degree. Further legislative or administrative guidance may be forthcoming on this point* among others." (*Mammoth*, *supra*, at p. 271, italics added.) We then added: "[C]ommon sense tells us that the majority of private

13

projects for which a government permit or similar entitlement is necessary are minor in scope — e.g., relating only to the construction, improvement, or operation of an individual dwelling or small business — and hence, in the absence of unusual circumstances, have little or no effect on the public environment. Such projects, accordingly, may be approved exactly as before the enactment of the [CEQA]." (*Id*. at p. 272.)

The Legislature immediately responded to *Mammoth* by amending CEQA through urgency legislation. (See *County of Inyo v. Yorty* (1973) 32 Cal.App.3d 795, 803.) As relevant here, it added section 21083, which generally directed the OPR, "as soon as possible," to "prepare and develop proposed guidelines for the implementation of [CEQA]," and directed the Secretary to "certify and adopt the [OPR's proposed] guidelines pursuant to" the Administrative Procedure Act. (Stats. 1972, ch. 1154, § 1, pp. 2271, 2272-2273.) These directives exist today as subdivisions (a) and (e) of section 21083. More specifically, in several provisions, the Legislature provided for categorical exemptions to CEQA. In section 21084, it provided: "The guidelines prepared and adopted pursuant to Section 21083 shall include a list of classes of projects which have been determined not to have a significant effect on the environment and which shall be exempt from the provisions of [CEQA]. In adopting the guidelines, the Secretary . . . shall make a finding that the list or classification of projects referred to in this section do not have a significant effect on the environment." (§ 21084, as added by Stats. 1972, ch. 1154, § 1, pp. 2271, 2273.) This provision remains substantively the same today. In former section 21085, the Legislature provided that "[a]ll classes of projects designated pursuant to Section 21084 . . . shall be exempt from the provisions of [CEQA]." (Stats. 1972, ch. 1154, § 1, pp. 2271, 2273.) The substance of this section appears today in section 21080, subdivision (b)(9), which provides that CEQA "does not apply" to "[a]ll classes of projects designated

14

pursuant to Section 21084." Finally, the Legislature enacted section 21086 to establish a mechanism for challenging the Secretary's categorical exemptions. (Stats. 1972, ch. 1154, § 1, pp. 2271, 2273-2274.) Subdivision (a) of that section provides: "A public agency may, at any time, request the addition or deletion of a class of projects, to the list designated pursuant to Section 21084. That request shall be made in writing to the [OPR] and shall include information supporting the public agency's position that the class of projects does, or does not, have a significant effect on the environment." Subdivision (b) of section 21086 requires the OPR to "review each request" and "submit" a recommendation to the Secretary, and authorizes the Secretary, "[f]ollowing the receipt of [the OPR's] recommendation," to "add or delete the class of projects to the list of classes of projects designated pursuant to Section 21084 that are exempt from the requirements of [CEQA]." Subdivision (c) of section 21086 then provides: "The addition or deletion of a class of projects, as provided in this section, to the list specified in Section 21084 shall constitute an amendment to the guidelines adopted pursuant to Section 21083 and shall be adopted in the manner prescribed in Sections 21083 and 21084."

Collectively, these provisions indicate that the Legislature intended to establish *by statute* "classes of projects" that "have been determined not to have a significant effect on the environment," to *require* the OPR and the Secretary to apply their expertise and identify those "classes" by "mak[ing] a finding" that the projects they comprise "do not have a significant effect on the environment," and to "exempt" from CEQA proposed projects within the classes the OPR and the Secretary have identified. (§ 21084, subd. (a).) This conclusion comports with the impetus for the Legislature's enactment of these provisions: our decision in *Mammoth*, which (1) observed that CEQA's applicability turns on "questions of degree," (2) stated that "the majority" of private projects "may be approved

15

exactly as before" CEQA's enactment because they "are minor in scope . . . and hence, in the absence of unusual circumstances, have little or no effect on the public environment," and (3) called for "[f]urther legislative or administrative guidance" on these issues. (*Mammoth*, *supra*, 8 Cal.3d at pp. 271-272.) To address these considerations, the Legislature, through the Guidelines, intended to enumerate classes of projects that *are* exempt from CEQA because, notwithstanding their *potential* effect on the environment, they already "have been determined not to have a significant effect on the environment." (§ 21084.) The Guidelines implement this intent, by setting forth the "classes of projects" that the Secretary, acting "[i]n response to [the Legislature's] mandate," "has found . . . do not have a significant effect on the environment." (Guidelines, § 15300.) Thus, construing the unusual circumstances exception as requiring more than a showing of a fair argument that the proposed activity may have a significant environmental effect is fully consistent with the Legislature's intent.

By contrast, as earlier explained, appellants' construction of the unusual circumstances exception would render useless and unnecessary the statutes the Legislature passed to identify and make exempt classes of projects that have no significant environmental effect. Try as they might, appellants can identify no purpose or effect of the categorical exemption statutes if, as they assert, a showing of a fair argument of a potential environmental effect precludes application of all categorical exemptions. Construing the unusual circumstances exception to apply any time there is a reasonable possibility of a significant environmental effect would, therefore, contravene our duty to adopt a construction that gives effect to all parts of the statutory and regulatory framework, rather than one that renders part of the framework "wholly useless and unnecessary." (*French Bank Case* (1879) 53 Cal. 495, 530.)

16

The concurring opinion's attempt to succeed where appellants have failed — i.e., to show that the categorical exemptions still have some "value" under their construction (conc. opn, *post*, at p. 9) — is also unpersuasive. The concurring opinion first asserts that proposed projects enjoy "a considerable procedural advantage" when an agency finds that they fall within the terms of an exempt category. (Conc. opn., *post*, at p. 10.) As to such projects, the concurring opinion notes, an agency need not follow any particular procedure, include any written determination, undertake an initial study, or adopt a negative declaration. (*Ibid*.) However, the same is true of proposed projects that fall within the terms of Guidelines section 15061, subdivision (b)(3), i.e., projects that are "not subject to CEQA" because "it can be seen with certainty that there is no possibility that [they] may have a significant effect on the environment." (See *Muzzy Ranch*, *supra*, 41 Cal.4th at p. 380 [initial study not required where Guidelines, § 15061, subd. (b)(3) applies].) As already explained, the concurring opinion's interpretation renders the categorical exemptions duplicative of this guideline, and the concurring opinion does not persuasively demonstrate otherwise. Thus, its discussion of these so-called procedural advantages fails to show that, under its interpretation, the categorical exemptions have independent value.

The concurring opinion also notes that, when an agency finds that a project meets the terms of a categorical exemption, it "impliedly finds that it has no significant impact," and "the burden shifts to" project opponents "to produce evidence" that the unusual circumstances exception applies. (Conc. opn, *post*, at pp. 9-10.) This is significant, the concurring opinion maintains, because "[i]n many cases, categorical exemptions are not litigated, and the applicability of the exemption is evident." (*Id*. at p. 10.)

However, even if a proposed project faces no opposition, an agency invoking a categorical exemption may not simply ignore the unusual

17

circumstances exception; it must "consider the issue of significant effects . . . in determining whether the project is exempt from CEQA where there is some information or evidence in the record that the project might have a significant environmental effect." (*Association for Protection etc. Values v. City of Ukiah* (1991) 2 Cal.App.4th 720, 732 (*Ukiah*).) This follows from Guidelines section 15061, subdivisions (a) and (b)(2), which, respectively, (1) direct a lead agency to determine whether a proposed project is "exempt from CEQA," and (2) specify that a project is exempt if a categorical exemption applies "and the application of that categorical exemption is not barred by one of the exceptions set forth in Section 15300.2." Thus, an agency may not apply a categorical exemption without considering evidence in its files of potentially significant effects, regardless of whether that evidence comes from its own investigation, the proponent's submissions, a project opponent, or some other source. Moreover, under the concurring opinion's interpretation, if those files contain "substantial evidence" of a mere "fair argument" that the project will have significant environmental effects, the agency may not apply a categorical exemption. (Conc. opn, *post*, at p. 14.) Thus, under the concurring opinion's interpretation of the unusual circumstances exception, the "considerable procedural advantage" the concurring opinion posits is largely illusory. (*Id*. at p. 10.)

Also illusory is the "second advantage" that, in the view of the concurring opinion, gives some value to categorical exemptions under its interpretation: the "*comparative* arguments" available to project proponents when an opponent invokes the unusual circumstances exception. (Conc. opn, *post*, at p. 11.) According to the concurring opinion, proponents may "argue," if "supported by evidence," that (1) the project's effects are "typical" of those generated by projects in the exempt category, "such that few or no projects in the category would be exempt if the effects were deemed significant," and (2) "the project's dimensions

18

or features are not unusual compared to typical projects in the exempt category, thereby suggesting that the project is similar to those that the Secretary has determined not to have a significant environmental effect." (*Id.* at pp. 11-12.) However, under the fair argument test the concurring opinion would apply here, "an agency is merely supposed to look to see if the record shows substantial evidence of *a fair argument* that there may be a significant effect. [Citations.] In other words, the agency is not to weigh the evidence to come to its own conclusion about whether there will be a significant effect. It is merely supposed to inquire, *as a matter of law*, whether the record reveals a fair argument. . . . ' "[I]t *does not resolve conflicts in the evidence* but determines only whether substantial evidence exists in the record to support the prescribed fair argument." ' [Citation.] " (*Banker's Hill, Hillcrest, Park West Community Preservation Group v. City of San Diego* (2006) 139 Cal.App.4th 249, 263 (*Banker's Hill*); see Guidelines, § 15064, subd. (f)(1) [a lead agency "presented with a fair argument that a project may have a significant effect on the environment . . . shall prepare an EIR even though it may also be presented with other substantial evidence that the project will not have a significant effect"].) Thus, under the concurring opinion's interpretation, evidence a project proponent offers to show that the project will only have typical effects, dimensions, and features is *irrelevant* if a project opponent can make a mere fair argument that those effects, dimensions, or features are not typical, or that the project will have a significant environmental effect. For these reasons, the concurring opinion fails to demonstrate that the categorical exemptions would retain any significant "value" under its interpretation. (Conc. opn, *post*, at p. 9.)

Moreover, contrary to the assertion of the concurring opinion, even were the categorical exemptions to retain some limited value under its construction, there would still be "reason[s]" (conc. opn, *post*, at p. 14) to reject that construction. First, as earlier explained (*ante*, p. 10), because that construction

19

would transform the phrase "due to unusual circumstances" into meaningless surplusage, it is one we "should avoid." (*Metcalf v. County of San Joaquin* (2008) 42 Cal.4th 1121, 1135.) Second, nothing suggests that either the Legislature or the Secretary intended the categorical exemptions to have such minuscule value. Had that been their intent, surely they would have expressed it in a more clear, concise, direct, and obvious way.

Accordingly, the Court of Appeal erred by holding that a potentially significant environmental effect itself constitutes an unusual circumstance. In listing a class of projects as exempt, the Secretary has determined that the environmental changes typically associated with projects in that class are not significant effects within the meaning of CEQA, even though an argument might be made that they are potentially significant. The plain language of Guidelines section 15300.2, subdivision (c), requires that a potentially significant effect must be "due to unusual circumstances" for the exception to apply. The requirement of unusual circumstances recognizes and gives effect to the Secretary's general finding that projects in the exempt class typically do not have significant impacts.

As to projects that meet the requirements of a categorical exemption, a party challenging the exemption has the burden of producing evidence supporting an exception. (*Davidon Homes v. City of San Jose* (1997) 54 Cal.App.4th 106, 115; see 1 Kostka & Zischke, Practice under the Cal. Environmental Quality Act (2d ed. 2008) § 5.71 (citing cases).) As explained above, to establish the unusual circumstances exception, it is not enough for a challenger merely to provide substantial evidence that the project *may* have a significant effect on the environment, because that is the inquiry CEQA requires absent an exemption. (§ 21151.) Such a showing is inadequate to overcome the Secretary's determination that the typical effects of a project within an exempt class are not significant for CEQA purposes. On the other hand, evidence that the project *will*

20

have a significant effect *does* tend to prove that some circumstance of the project is unusual. An agency presented with such evidence must determine, based on the entire record before it — including contrary evidence regarding significant environmental effects — whether there is an unusual circumstance that justifies removing the project from the exempt class.

This reading of the guideline is not inconsistent with the phrase "reasonable possibility that the activity will have a significant effect on the environment." (Guidelines, § 15300.2, subd. (c).) A party invoking the exception may establish an unusual circumstance without evidence of an environmental effect, by showing that the project has some feature that distinguishes it from others in the exempt class, such as its size or location. In such a case, to render the exception applicable, the party need only show a reasonable possibility of a significant effect due to that unusual circumstance. Alternatively, under our reading of the guideline, a party may establish an unusual circumstance with evidence that the project will have a significant environmental effect. That evidence, if convincing, necessarily also establishes "a reasonable possibility that the activity will have a significant effect on the environment due to unusual circumstances." (Guidelines, § 15300.2, subd. (c).)

As this discussion demonstrates, our approach is consistent with the concurring opinion's statement of its central proposition: "When it is *shown* that a project otherwise covered by a categorical exemption *will* have a significant environmental effect, it necessarily follows that the project presents unusual circumstances." (Conc. opn, *post*, at p. 2, italics added.) However, for reasons already set forth, we part company with the concurring opinion when it moves from this central proposition to the conclusion that a reviewing court must find the exception applicable, and overturn an agency's application of an exemption, if there is "substantial evidence" of "a fair argument that the project will have

21

significant environmental effects." (*Ibid.*) The Secretary, in complying with the Legislature's command to determine the "classes of projects" that "do not have a significant effect on the environment" (§ 21084, subd. (a)), necessarily resolved any number of "fair arguments" as to the *possible* environmental effects of projects in those classes. Allowing project opponents to negate those determinations based on nothing more than "a fair argument that the project will have significant environmental effects" (conc. opn., *post*, at p. 12) would be fundamentally inconsistent with the Legislature's intent in establishing the categorical exemptions.

Appellants assert that *Wildlife Alive v. Chickering* (1976) 18 Cal.3d 190 (*Chickering*) precludes us from construing the unusual circumstances exception to require a showing of something more than a potentially significant environmental effect. There, we held in relevant part that the setting of hunting and fishing seasons by the Fish and Game Commission (Commission) was not exempt from CEQA under Guidelines former section 15107. (*Chickering*, *supra*, at p. 205.) That former guideline established a categorical exemption for " 'actions taken by regulatory agencies . . . to assure the maintenance, restoration, or enhancement of a natural resource where the regulatory process involves procedures for protection of the environment' " (*id.* at p. 204), and it described as an example " 'the wildlife preservation activities of the State Department of Fish and Game.' " (*Id.* at p. 205.) We gave two reasons for finding this exemption inapplicable on its terms. First, the Commission "is not" the Department of Fish and Game. (*Ibid.*) Second, and "[m]ore significantly," several of the statutes that granted powers and duties to the Department of Fish and Game "contemplate projects specifically designed for the preservation of wildlife." (*Ibid.*) These are the "departmental functions" to which the former guideline referred in mentioning "[t]he 'wildlife preservation activities of the State Department of Fish and Game.' " (*Ibid.*) "The

22

[Commission's] fixing of hunting seasons, while doubtless having an indirect beneficial effect on the continuing survival of certain species, cannot fairly or readily be characterized as a *preservation activity* in a strict sense." (*Ibid*.)

After concluding in *Chickering* that the Commission's activity did not fall within the language of the former guideline, we discussed why it would have been problematic to "expand[]" that "language to imply" an exemption for that activity. (*Chickering*, *supra*, 18 Cal.3d at p. 206.) Doing so, we stated, would contravene the "principle" that "CEQA must be interpreted so as to afford the 'fullest possible protection' to the environment." (*Ibid*.) Moreover, we explained in a passage appellants quote, "if" we "expand[ed]" (*id*. at p. 206) the former guideline's language "to cover the commission's hunting program, it is doubtful that such a categorical exemption [would be] authorized under the statute. . . . [N]o regulation is valid if its issuance exceeds the scope of the enabling statute. [Citations.] The secretary is empowered to exempt only those activities which do not have a significant effect on the environment. (Pub. Resources Code, § 21084.) It follows that where there is any reasonable possibility that a project or activity may have a significant effect on the environment, an exemption would be improper," and "the setting of hunting and fishing seasons has the potential for a significant environmental impact . . . ." (*Id*. at pp. 205-206.)

For several reasons, appellants' reliance on *Chickering* is unavailing. First, *Chickering* predated the Secretary's adoption of the unusual circumstances exception and, thus, addressed neither the meaning nor the validity of that exception. Second, as here relevant, the only issue in *Chickering* was whether the Commission's activity fell within the scope of Guidelines former section 15107l. After concluding it did not, we added the discussion appellants cite, which, to buttress our conclusion, explored the validity of a *hypothetical* exemption that would include the Commission's activity. (*Chickering*, *supra*, 18 Cal.3d at pp.

23

205-206.)  Third, because that added discussion was tangential to the issue before us and unnecessary to resolve the case, it was, understandably, summary.  For example, it did not consider the broader statutory framework, the evolution of the CEQA statutes, or the implications of its statement for the effectiveness of various other CEQA statutes.  Finally, in 1993, after we decided *Chickering*, the Legislature enacted section 21083.1, which directs courts "not [to] interpret [the CEQA statutes] *or the state guidelines adopted pursuant to Section 21083* in a manner which imposes procedural or substantive requirements beyond those *explicitly stated in* [CEQA] *or in the state guidelines*."  (§ 21083.1, italics added.)  According to the legislative history, the purpose of this statute was to "limit judicial expansion of CEQA requirements" and to " 'reduce the uncertainty and litigation risks facing local governments and project applicants by providing a "safe harbor" to local entities and developers who comply with the explicit requirements of the law.' "  (Assem. Com. on Natural Resources, Analysis of Sen. Bill No. 722 (1993-1994 Reg. Sess.) for hearing on July 12, 1993, p. 2.)  Given appellants' concession for purposes of appeal that the proposed project here falls within two of the categorical exemptions, under Guidelines section 15300.2, subdivision (c), environmental review is necessary only if "there is a reasonable possibility [the project] will have a significant effect on the environment due to unusual circumstances."  Given that the listing of a class of projects as exempt constitutes the Secretary's finding, pursuant to the Legislature's command, that the typical effects of projects within that class are not significant within the meaning of CEQA, interpreting the unusual circumstances exception to require environmental review absent unusual circumstances would violate the Legislature's express directive in section 21083.1 "not [to] interpret" the CEQA statutes *and the Guidelines* "in a manner which imposes procedural or substantive requirements beyond those" the statutes *and the Guidelines* "explicitly state[]."

As we have explained, "in the . . . years since CEQA was enacted the Legislature has, for reasons of policy, expressly exempted several categories of projects from environmental review. (See § 21080, subd. (b)(1)-[(15)].) This court does not sit in review of the Legislature's wisdom in balancing these policies against the goal of environmental protection because, no matter how important its original purpose, CEQA remains a legislative act, subject to legislative limitation and legislative amendment." (*Napa Valley Wine Train, Inc. v. Public Utilities Com.* (1990) 50 Cal.3d 370, 376.) Consistent with section 21083.1's directive, we have held that "rules regulating the protection of the environment must not be subverted into an instrument for the oppression and delay of social, economic, or recreational development and advancement." (*Citizens of Goleta Valley v. Board of Supervisors* (1990) 52 Cal.3d 553, 576.) Adopting appellants' interpretation would do precisely that, by requiring environmental review of projects that one could argue *may* have a significant environmental effect, but that the OPR and the Secretary, exercising the authority the Legislature has by statute delegated to them and required them to exercise, *have already determined do not*, *in fact,* "have a significant effect on the environment." (§ 21084, subd. (a).)

Appellants also substantially rely on this court's decision in *Mountain Lion Foundation v. Fish and Game Commission* (1997) 16 Cal.4th 105 (*Mountain Lion*). There, the majority held in relevant part that the same categorical exemption previously at issue in *Wildlife Alive* — which had been renumbered as Guidelines section 15307 — did not apply to the Commission's decision to remove the Mojave ground squirrel from the threatened species list. (*Mountain Lion*, *supra*, at pp. 124-127.) As noted earlier, that guideline establishes an exemption for "actions taken by regulatory agencies as authorized by state law or local ordinance to assure the maintenance, restoration, or enhancement of a natural resource where the regulatory process involves procedures for protection of the

25

environment." (Guidelines, § 15307.) The majority found that "a delisting action cannot be fairly included within this class" because it "removes rather than secures [the] protections" that an endangered or threatened species enjoys under the California Endangered Species Act. (*Mountain Lion*, *supra*, at p. 125.) Moreover, the majority added, in light of other Guidelines, a delisting *could not* come within a categorical exemption. "[A] categorical exemption represents a determination by the Secretary that a particular project does not have a significant effect on the environment. (§ 21084.)" (*Mountain Lion*, *supra*, at 124.) "It follows," the majority stated in the passage on which appellants rely, "that an activity that may have a significant effect on the environment cannot be categorically exempt." (*Ibid.*) Under Guidelines section 15065, subdivision (a), an agency "*must* find" that a proposed project may have that effect if it has " 'the potential to . . . reduce the . . . number or restrict the range of an endangered, rare or threatened species.' " (*Mountain Lion*, *supra*, at p. 124.) Because a delisting, by "withdraw[ing] existing levels of protection," "creates at least the potential for population reduction or habitat restriction," this guideline "obligate[s]" the Commission "to find a delisting may have a significant environmental effect. Such a finding precludes invocation of a categorical exemption." (*Ibid.*)

For reasons similar to those earlier discussed in connection with *Chickering*, *supra*, 18 Cal.3d 190, appellants' reliance on *Mountain Lion* is unavailing. Like *Chickering*, *Mountain Lion* addressed neither the meaning nor the validity of the unusual circumstances exception. Also like *Chickering*, as here relevant, *Mountain Lion* presented only the issue of whether the Commission's activity fell within the express terms of a categorical exemption. Because the court found it did not, the hypothetical discussion of whether the Secretary *could* have established a categorical exemption was tangential, unnecessary, and summary. In any event, properly understood, the discussion in *Mountain Lion*

26

stands only for the proposition that the Secretary, having established in one guideline that a delisting may have a significant effect on the environment, may not in another guideline "make a finding" that delistings, as a class, "do not have a significant effect on the environment" and are therefore exempt from CEQA. (§ 21084.) It does not, as appellants assert, establish that where the Secretary, exercising statutorily delegated authority, has found that projects of a certain kind "do not have a significant effect on the environment" and are exempt from CEQA, a proposed project that falls within that class and does not involve any unusual circumstances is, nonetheless, subject to environmental review if an argument can be made that it *may* have a significant effect on the environment. That question simply was not before us in *Mountain Lion*, *supra*, 16 Cal.4th 105.[3]

## B. Standards of Review.

Several CEQA statutes expressly address judicial review of agency action. Section 21168 provides the standard of review for decisions "made as a result of a proceeding in which by law a hearing is required to be given, evidence is required to be taken and discretion in the determination of facts is vested in a public agency." Section 21168.5 provides the standard of review in all other actions "to attack, review, set aside, void or annul a determination, finding, or decision of a public agency on the grounds of noncompliance with [CEQA]." Because nothing required the City to hold an evidentiary hearing in this case, the latter section governs. Under it, a court's inquiry is "whether there was a prejudicial abuse of discretion. Abuse of discretion is established if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by

---

[3]    Consistent with the preceding analysis, we disapprove *Communities for a Better Environment v. California Resources Agency* (2002) 103 Cal.App.4th 98, 129, insofar as it suggests that a proposed project's potential environmental effects alone render the unusual circumstances exception applicable.

27

substantial evidence." (*Ibid*.) Thus, reversal of the City's action here is appropriate only if (a) the City, in finding the proposed project categorically exempt, did not proceed in the manner required by law, or (b) substantial evidence fails to support that finding.**4**

The parties disagree about how these standards apply to an agency's determination that the unusual circumstances exception is inapplicable. Respondents, invoking the traditional substantial evidence standard, argue that a reviewing court must uphold such a determination if substantial evidence supports it, even if substantial evidence in the record also shows that a contrary conclusion would be equally, or even more, reasonable. Appellants, on the other hand, contend that, even if substantial evidence supports the agency's determination, a reviewing court must overturn the determination if there is a fair argument based on substantial evidence that the proposed project may have a significant effect on the environment due to unusual circumstances. A fair argument exists, appellants assert, "if *any* facts, fact-based assumptions, or expert opinion in the administrative record support . . . arguments that [the] exception may apply, regardless of contrary evidence."

The fair argument approach derives from our application of section 21168.5 in *No Oil, Inc. v. City of Los Angeles* (1974) 13 Cal.3d 68 (*No Oil*). There, we

---

**4** We have previously observed that "the standard of review is essentially the same" under sections 21168 and 21168.5. (*Laurel Heights Improvement Assn. v. Regents of University of California* (1993) 6 Cal.4th 1112, 1133, fn. 17 (*Laurel Heights II*).) Section 21168 requires review "in accordance with the provisions of Section 1094.5 of the Code of Civil Procedure," and declares that "the court shall not exercise its independent judgment on the evidence but shall only determine whether the act or decision is supported by substantial evidence in the light of the whole record." Code of Civil Procedure section 1094.5, subdivision (b), provides, similarly to section 21168.5, that "[a]buse of discretion is established if the respondent has not proceeded in the manner required by law, the order or decision is not supported by the findings, or the findings are not supported by the evidence."

28

reviewed the City of Los Angeles's application of section 21151, which requires preparation of an EIR for a nonexempt project that "may have a significant effect on the environment." Although the proposed project in *No Oil* did not qualify for an exemption under the CEQA statutes or the Guidelines, Los Angeles had found, after conducting an initial threshold environmental study, that no EIR was necessary because the project would not have a significant effect on the environment. We reversed, concluding that the finding constituted a prejudicial abuse of discretion under section 21168.5 because, in making it, Los Angeles had failed to proceed as required by law in two ways: (1) it had not made its determination in writing; and (2) it had used the wrong standard to determine whether the proposed project might have a significant effect on the environment. Regarding the latter, we construed section 21151 to require preparation of an EIR for a nonexempt project "whenever it can be fairly argued on the basis of substantial evidence that the project may have a significant environmental impact." (*No Oil*, *supra*, at p. 75.) At the trial court's direction, Los Angeles had applied "a far more restrictive test that limited use of an EIR to projects which may have an 'important' or 'momentous' effect of semi-permanent duration." (*Ibid.*) In reaching our conclusion, we cited the following factors: (1) "the preparation of an EIR is the key to environmental protection under CEQA" (*ibid.*); (2) the statute speaks, not of projects that *will* have a significant effect on the environment, but of projects that "*may*" have such effect (*id.* at p. 83, fn. 16); (3) the Legislature intended that CEQA be interpreted to afford the fullest protection to the environment within the reasonable scope of the statutory language, but the test Los Angeles had applied afforded the least possible protection within the statutory language (*id.* at p. 85); and (4) by "bar[ring] preparation of an EIR" in "close and doubtful cases," the test Los Angeles applied would "defeat the Legislature's objective of ensuring that environmental protection serve as the

29

guiding criterion in agency decisions" (*id.* at p. 84).  Because we concluded that Los Angeles had failed to proceed as required by law, in part by applying the wrong standard, we expressly declined to decide whether its decision was "supported by substantial evidence."  (*Id.* at p. 75.)

The Natural Resources Agency has since expressly incorporated *No Oil*'s fair argument approach into the Guidelines.  Guidelines section 15064, subdivision (f)(1), now states:  "If the lead agency determines there is substantial evidence in the record that the project may have a significant effect on the environment, the lead agency shall prepare an EIR (*Friends of B Street v. City of Hayward* (1980) 106 Cal. App. 3d 988).  Said another way, if a lead agency is presented with a fair argument that a project may have a significant effect on the environment, the lead agency shall prepare an EIR even though it may also be presented with other substantial evidence that the project will not have a significant effect (*No Oil, Inc. v. City of Los Angeles* (1974) 13 Cal. 3d 68)."[5]  If, however, an agency's "initial study" for a nonexempt project "shows that there is no substantial evidence that the project may have a significant effect" on the environment, the agency "prepares a negative declaration" (Guidelines, § 15002, subd. (k)(2)) describing "the reasons" why no EIR is required (§ 21064).

The fair argument standard Guidelines section 15064, subdivision (f)(1), sets forth applies by its terms to determinations of a *lead agency*, not of a court. Under sections 21168 and 21168.5, judicial review of agency decisions is for abuse of discretion.  (*Laurel Heights II*, *supra*, 6 Cal.4th at p. 1135.)  The scope of review of an agency's application of the fair argument standard is described in *Friends of "B" Street v. City of Hayward* (1980) 106 Cal.App.3d 988, 1002

---

[5]    This guideline first appeared in 1983 as Guidelines section 15064, subdivision (g)(1).  (See Guidelines, § 15064, Register 83, No. 29 (July 16, 1983) p. 308.)

(*Friends of "B" Street*), a decision that section 15064, subdivision (f)(1), cites. *Friends of "B" Street* explained that a reviewing court may not uphold an agency's decision "merely because substantial evidence was presented that the project would not have [a significant environmental] impact. The [reviewing] court's function is to determine whether substantial evidence support[s] the agency's conclusion as to whether the prescribed 'fair argument' could be made. If there [is] substantial evidence that the proposed project might have a significant environmental impact, evidence to the contrary is not sufficient to support a decision to dispense with preparation of an EIR and adopt a negative declaration, because it [can] be 'fairly argued' that the project might have a significant environmental impact. Stated another way, if the [reviewing] court perceives substantial evidence that the project might have such an impact, but the agency failed to secure preparation of the required EIR, the agency's action is to be set aside because the agency abused its discretion by failing to proceed 'in a manner required by law.' " (*Friends of "B" Street*, *supra*, at p. 1002.)

There have been several attempts to extend the fair argument standard to CEQA determinations other than the one at issue in *No Oil*, *supra*, 13 Cal.3d 68, i.e., whether to prepare an EIR for a nonexempt project. We considered, and rejected, one such attempt in *Laurel Heights II*, which involved an agency's decision not to recirculate an EIR for public comment. Section 21092.1 requires recirculation if "significant new information is added to" an EIR after initial circulation and before certification. In *Laurel Heights II*, a neighborhood improvement association argued that in determining whether recirculation is required, "the 'fair argument' test used to review the decision . . . to prepare a negative declaration" in lieu of an EIR should apply. (*Laurel Heights II*, *supra*, 6 Cal.4th at p. 1134.) We disagreed, explaining: "[S]ection 21151 commands that an EIR must be prepared whenever a project '*may* have a significant effect on the

31

environment.' (Italics added.) In *No Oil . . .*, we interpreted *section 21151* to require preparation of an EIR whenever it can be fairly argued on the basis of substantial evidence that the project may have significant environmental impact. [Citation.] Our decision, however, expressly acknowledged that *judicial review* of agency decisions under CEQA is governed by sections 21168 (administrative mandamus) and 21168.5 (traditional mandamus) and, of course, did not purport to alter the standard of review set forth in those statutes. Rather, the 'fair argument' test was derived from an interpretation of the language of, and policies underlying, section 21151 itself. For this reason, the 'fair argument' test has been applied *only* to the decision whether to prepare an original EIR or a negative declaration. [Citations.] The Association has advanced no persuasive authority or reasons for taking this test out of the context of the statutory language of section 21151 and applying it to an agency's decision under section 21092.1. [¶] We conclude that the substantial evidence standard set forth in section 21168.5 governs the [agency's] decision not to recirculate the EIR in this case." (*Id.* at pp. 1134-1135, fns. omitted.)

Several courts, however, have extended the fair argument approach to aspects of the determination whether the unusual circumstances exception applies. (*Voices for Rural Living v. El Dorado Irr. Dist.* (2012) 209 Cal.App.4th 1096, 1108 (*Voices*); *Wollmer v. City of Berkeley* (2011) 193 Cal.App.4th 1329, 1350; *Banker's Hill, supra,* 139 Cal.App.4th at pp. 261-267; *Azusa Land Reclamation Co. v. Main San Gabriel Basin Watermaster* (1997) 52 Cal.App.4th 1165, 1206; *Dunn-Edwards Corp. v. Bay Area Air Quality Management Dist.* (1992) 9 Cal.App.4th 644, 654-656.) Other courts have noted judicial disagreement as to whether the fair argument standard applies in this context, but have declined to decide the issue, finding that the standard's application would not have affected the result. (*Save the Plastic Bag Coalition v. City and County of San Francisco*

32

(2013) 222 Cal.App.4th 863, 879; *Hines v. California Coastal Commission* (2010) 186 Cal.App.4th 830, 855; *San Lorenzo Valley Community Advocates for Responsible Educ. v. San Lorenzo Valley Unified School Dist*. (2006) 139 Cal.App.4th 1356, 1390; *Santa Monica Chamber of Commerce v. City of Santa Monica* (2002) 101 Cal.App.4th 786, 796 (*Santa Monica*); *Fairbank v. City of Mill Valley* (1999) 75 Cal.App.4th 1243, 1259-1260; *Ukiah*, *supra*, 2 Cal.App.4th at p. 728, fn. 7.) The principal supporting authority these courts cite for the fair argument standard's inapplicability is *Centinela Hospital Assn. v. City of Inglewood* (1990) 225 Cal.App.3d 1586. There, in rejecting the claim that the unusual circumstances exception applied, the court reasoned: "When appellant argues that the facility is located 'at an extremely sensitive location in terms of public usage and traffic,' and it 'will create a health and safety hazard, which in turn, will place increased demands on public services such as police and fire protection,' appellant is asking us to adopt an improper standard of review and independently reweigh the evidence. We conclude that substantial evidence supports the express findings of the [City of Inglewood Planning] Commission and city council as to traffic and public health and safety issues and substantial evidence supports the implied finding in the notice of exemption that the facility would not cause any significant environmental effects."**6** (*Centinela*, at p. 1601.)

We conclude that both prongs of section 21168.5's abuse of discretion standard apply on review of an agency's decision with respect to the unusual circumstances exception. The determination as to whether there are "unusual circumstances" (Guidelines, § 15300.2, subd. (c)) is reviewed under section 21168.5's substantial evidence prong. However, an agency's finding as to

---

**6** The courts noting judicial disagreement regarding the applicable standard also cite *Dehne v. County of Santa Clara* (1981) 115 Cal.App.3d 827, but that decision does not mention or discuss the unusual circumstances exception.

whether unusual circumstances give rise to "a reasonable possibility that the activity will have a significant effect on the environment" (Guidelines, § 15300.2, subd. (c)) is reviewed to determine whether the agency, in applying the fair argument standard, "proceeded in [the] manner required by law." (§ 21168.5; *Friends of "B" Street*, *supra*, 106 Cal.App.3d at p. 1002.)

Whether a particular project presents circumstances that are unusual for projects in an exempt class is an essentially factual inquiry, " 'founded "on the application of the fact-finding tribunal's experience with the mainsprings of human conduct." ' " (*People v. Louis* (1986) 42 Cal.3d 969, 987.) Accordingly, as to this question, the agency serves as "the finder of fact" (*Save Our Peninsula Committee v. Monterey County Board of Supervisors* (2001) 87 Cal.App.4th 99, 117), and a reviewing court should apply the traditional substantial evidence standard that section 21168.5 incorporates. (*Save Our Peninsula Committee*, at p. 117.) Under that relatively deferential standard of review, the reviewing court's " 'role' " in considering the evidence differs from the agency's. (*Western States Petroleum Assn. v. Superior Court* (1995) 9 Cal.4th 559, 576.) " 'Agencies must weigh the evidence and determine "which way the scales tip," while courts conducting [traditional] substantial evidence . . . review generally do not.' " (*Ibid.*) Instead, reviewing courts, after resolving all evidentiary conflicts in the agency's favor and indulging in all legitimate and reasonable inferences to uphold the agency's finding, must affirm that finding if there is any substantial evidence, contradicted or uncontradicted, to support it. (*Id.* at p. 571; see *Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 393 `(*Laurel Heights I* ) [reviewing court's "task is not to weigh conflicting evidence and determine who has the better argument" or whether "an opposite conclusion would have been equally or more reasonable"].)

As to the whether there is "a reasonable possibility" that an unusual circumstance will produce "a significant effect on the environment" (Guidelines, § 15300.2, subd. (c)), a different approach is appropriate, both by the agency making the determination and by reviewing courts.  As we explained in *Laurel Heights II*, *supra*, 6 Cal.4th at pages 1134-1135, the fair argument standard "was derived from an interpretation of the language of, and policies underlying," the statute at issue in *No Oil* — section 21151 — which "commands that an EIR must be prepared whenever a project 'may have a significant effect on the environment.' " (Italics omitted.)  As the Court of Appeal observed in *Banker's Hill*, *supra*, 139 Cal.App.4th at page 264, there are "close textual similarities" between this statutory language and the language of Guidelines section 15300.2, subdivision (c), which precludes application of categorical exemptions "where there is *a reasonable possibility* that the activity will have a significant effect on the environment due to unusual circumstances." (Italics added.)  Notably, we observed in *No Oil* that "the word 'may' connotes a 'reasonable possibility . . . .' " (*No Oil*, *supra*, 13 Cal.3d at p. 83, fn. 16.)  Accordingly, when there are "unusual circumstances," it is appropriate for agencies to apply the fair argument standard in determining whether  "there is a reasonable possibility of a significant effect on the environment due to unusual circumstances." (Guidelines, § 15300.2, subd. (c).)  As to this question, the reviewing court's function "is to determine whether substantial evidence support[s] the agency's conclusion as to whether the prescribed 'fair argument' could be made." (*Friends of "B" Street*, *supra*, 106 Cal.App.3d at p. 1002.)

This bifurcated approach to the questions of unusual circumstances and potentially significant effects comports with our construction of the unusual circumstances exception to require findings of *both* unusual circumstances *and* a potentially significant effect.  It would be inappropriate for an agency to apply the

fair argument standard to determine whether unusual circumstances exist. That standard is intended to guide the determination of whether a project has a potentially significant effect, not whether it presents unusual circumstances. While evidence of a significant effect may be offered to prove unusual circumstances, circumstances do not become unusual merely because a fair argument can be made that they might have a significant effect. Evidence that a project *may* have a significant effect is not alone enough to remove it from a class consisting of similar projects that the Secretary has found "*do not* have a significant effect on the environment." (§ 21084, subd. (a), italics added; cf. *Laurel Heights II*, *supra*, 6 Cal.4th at p. 1134; *No Oil*, *supra*, 13 Cal.3d at p. 83, fn. 16 .) Therefore, an agency must weigh the evidence of environmental effects along with all the other evidence relevant to the unusual circumstances determination, and make a finding of fact. Judicial review of such determinations is limited to ascertaining whether they are "supported by substantial evidence." (§ 21168.5.)

On the other hand, when unusual circumstances are established, the Secretary's findings as to the typical environmental effects of projects in an exempt category no longer control. Because there has been no prior review of the effects of unusual circumstances, the policy considerations we discussed in *No Oil* apply. An agency must evaluate potential environmental effects under the fair argument standard, and judicial review is limited to determining whether the agency applied the standard "in [the] manner required by law." (§ 21168.5.)

We reject respondents' assertion that applying two different standards to the unusual circumstances exception is "fundamentally inconsistent with the legal framework for categorical exemptions" and would, by making the process "too complicated and cumbersome," "defeat the Legislature's intent in having categorical exemptions." As explained above, requiring an agency to apply the

36

fair argument standard to determine whether unusual circumstances give rise to "a reasonable possibility that the activity will have a significant effect on the environment" (Guidelines, § 15300.2, subd. (c)) is fully consistent with CEQA's framework and the Legislature's intent to provide categorical exemptions. Nor, for a reviewing court, is there anything particularly "complicated" or "cumbersome" about applying section 21168.5's substantial evidence prong to unusual circumstance determinations, and its "proceeded in a manner required by law" prong to determinations as to potentially significant effects. Courts are well versed in bringing a variety of considerations to bear in making such determinations.

Contrary to respondents' assertion, applying the fair argument standard to aspects of the unusual circumstances exception does not conflict with our decision in *Muzzy Ranch*, *supra*, 41 Cal.4th 372. The premise of respondents' argument is that, in *Muzzy Ranch*, we applied the traditional substantial evidence test in reviewing an agency's determination under Guidelines section 15061, subdivision (b)(3), that a proposed project was not subject to CEQA. However, in *Muzzy Ranch*, we had no occasion to identify the standard of review we applied. Moreover, as appellants explain, the language of Guidelines section 15061, subdivision (b)(3), is considerably different from the language of the unusual circumstances exception; the former applies "[w]here it can be seen with certainty that there is no possibility that the activity in question may have a significant effect on the environment" (Guidelines, § 15061, subd. (b)(3)), whereas the latter applies "where there is a reasonable possibility that the activity will have a significant effect on the environment due to unusual circumstances" (Guidelines, § 15300.2, subd. (c)). Thus, even under respondents' reading of *Muzzy Ranch*, applying the fair argument standard in the context of the unusual circumstances exception creates no conflict with that decision.

37

Finally, and again contrary to respondents' assertion, our approach is fully consistent with — and is, indeed, affirmatively supported by — the decision in *Valley Advocates v. City of Fresno* (2008) 160 Cal.App.4th 1039. At issue there were the following CEQA provisions: (1) section 21084.1, which provides that "[a] project that may cause a substantial adverse change in the significance of an historical resource is a project that may have a significant effect on the environment"; (2) section 21084, subdivision (e), which provides that "[a] project that may cause a substantial adverse change in the significance of a historical resource, as specified in Section 21084.1, shall not be exempted from [CEQA] pursuant to subdivision (a)"; and (3) Guidelines section 15300.2, subdivision (f), which provides that "[a] categorical exemption shall not be used for a project which may cause a substantial adverse change in the significance of a historical resource." The court held that, in applying these provisions, "the fair argument standard does not govern" an agency's determination of whether a building qualifies as a "historical resource." (*Valley Advocates*, *supra*, at p. 1072.) However, the court continued, "once the resource has been determined to be an historical resource, then the fair argument standard applies to the question whether the proposed project 'may cause a substantial adverse change in the significance of an historical resource' [citation] and thereby have a significant effect on the environment." (*Ibid.*) This discussion supports the conclusion that, if "unusual circumstances" are established, an agency should apply the fair argument standard in determining whether there is "a reasonable possibility" that those circumstances will produce "a significant effect" within the meaning of CEQA. (Guidelines, § 15300.2, subd. (c).)

### C. *Lower Court Rulings.*

In reviewing the City's determination that the unusual circumstances exception does not apply, the trial court identified and made "two separate

38

determinations": (1) whether "there is a reasonable possibility that the activity will have a significant effect on the environment"; and (2) "whether such reasonable possibility of a significant effect is due to unusual circumstances associated with the project." It answered the first question in the affirmative, explaining in part that, "[d]espite Respondents' criticisms of [Karp's] report and [his] methodology, and even when discounting the clearly erroneous and misleading portions, Dr. Karp's opinion" regarding the " 'probability of seismic lurching of oversteepened side-hill fills' " "provides substantial evidence of a fair argument of a significant environmental effect consequent to the Project." However, the court also found that the proposed project did not present "unusual circumstances," explaining: "Though the Project involves a large house, built in the hills on a steep slope, there is nothing so out of the ordinary about such a project that it would take it out of the exemption. Moreover, there is no evidence to support a finding that any of the circumstances surrounding the Project make it 'unusual.' . . . [T]hough it is a large house proposed to be built on a large and steep hillside lot with grading and retaining walls, the Project is not so unusual for a single family residence, particularly in this vicinity, as to constitute the type of unusual circumstances required to support application of this exception."

In reversing the judgment, the Court of Appeal agreed with the trial court "that Karp's letters . . . amounted to substantial evidence of a fair argument that the proposed construction would result in significant environmental impacts." But it disagreed that the unusual circumstances exception applies only if the proposed project's potentially significant environmental effects are due to unusual circumstances. In the Court of Appeal's view, "the fact" that the proposed project "may" have a significant effect on the environment "is *itself* an unusual circumstance" that "preclude[s]" the City from applying a categorical exemption. The Court of Appeal went on to note that it may nevertheless "be helpful" to

39

determine "whether unusual circumstances exist" apart from the project's potentially significant environmental effect. Considering this question de novo, it found that, with respect to the Class 3 small structure exemption, the proposed project's size constitutes such a circumstance. In reaching this result, it reasoned that "whether a circumstance is unusual 'is judged relative to the *typical* circumstances related to an otherwise *typically exempt project*,' as opposed to the typical circumstances in one particular neighborhood." As to the Class 32 in-fill development exemption, the court offered no additional analysis.

It is apparent that neither the trial court nor the Court of Appeal applied principles like those we have set out above. Remand for application of the standards we announce today is therefore both appropriate and necessary.[7]

The Court of Appeal erred in another respect by indicating, as noted above, that the unusual circumstances inquiry excludes consideration of "the typical circumstances in one particular neighborhood." In a number of decisions, our appellate courts have looked to conditions in the immediate vicinity of a proposed project to determine whether the unusual circumstances exception applied. (*Bloom v. McGurk* (1994) 26 Cal.App.4th 1307, 1315-1316; *City of Pasadena v. State of California* (1993) 14 Cal.App.4th 810, 826-827; *Ukiah*, *supra*, 2 Cal.App.4th at p. 736.) Indeed, in the only decision the Court of Appeal cited for its contrary view — *Santa Monica*, *supra*, 101 Cal.App.4th 786 — the court

---

**7**     In reversing based on potential geotechnical effects, the Court of Appeal did not address other potential effects appellants allege, including aesthetic and view impacts, inconsistencies with land use plans and policies the City has adopted for environmental protection, construction-related traffic impacts, and permanent traffic impacts related to contemplated fundraising activities at the house. Nor did the Court of Appeal address appellants' argument that the City's adoption of a traffic management plan is a mitigation measure that precludes a finding that the proposed project is categorically exempt. Rather than address these issues here in the first instance, we leave their consideration to the Court of Appeal on remand.

40

quoted *Ukiah* on this point and declared it to be "instructive." (*Santa Monica*, at p. 802.) Insofar as these decisions indicate that local conditions are relevant, we agree. In determining whether the environmental effects of a proposed project are unusual or typical, local agencies have discretion to consider conditions in the vicinity of the proposed project.

Respondents separately attack the conclusion of both the trial court and the Court of Appeal that Karp's submissions constitute substantial evidence of a fair argument that the proposed project may have a significant environmental effect. As earlier noted, Karp opined that the proposed project "is likely to have very significant environmental impacts . . . due to the probability of seismic lurching of the oversteepened side-hill fills." Respondents contend that Karp's opinion does not constitute substantial evidence of a fair argument because it is based on a misreading of the plans the City approved. In their view, the evidence in the record, including the submissions of Kropp and Toby, conclusively establishes that "the project approved by the City does *not* involve 'side-hill fill' " and that Karp was mistaken in reading the plans otherwise. Because of Karp's erroneous belief there would be side-hill fill, his opinion, respondents assert, "is not substantial evidence." A finding of potential environmental impacts, respondents argue, must be based on the proposed project as actually approved, and may not be based on unapproved activities that opponents assert will be necessary because the project as approved cannot be built. If the proposed project "cannot be built as approved" and applicants want to build a different project, then "they must return to the City for approval of a different project and the City could issue a stop-work notice to prevent unauthorized construction."

We agree with respondents that a finding of environmental impacts must be based on the proposed project as actually approved and may not be based on unapproved activities that opponents assert will be necessary because the project,

41

as approved, cannot be built. In *Laurel Heights I*, *supra*, 47 Cal.3d at page 395, we considered whether there are circumstances under which an EIR must address "future action related to" a proposed project. There, the University of California, San Francisco (UCSF), had certified an EIR for moving its school of pharmacy to 100,000 square feet of a 354,000-square-foot building it had purchased. (*Id.* at p. 393.) Although UCSF admitted it intended to use the remainder of the building when existing tenants left, the EIR it prepared did not consider the potential environmental effect of that intended future use. (*Id.* at pp. 393, 397.) To justify this omission, UCSF argued that it had "not formally decided *precisely* how [it would] use the remainder of the building." (*Id.* at p. 396.) In rejecting this argument, we first held that an EIR for a proposed project must consider the potential environmental effects of future expansion if expansion (1) "is a reasonably foreseeable consequence of the initial project" and (2) "will be significant in that it will likely change the scope or nature of the initial project or its environmental effects." (*Ibid*.) This standard, we reasoned, properly balances the following considerations: (1) delayed review may produce "bureaucratic and financial momentum" that "provid[es] a strong incentive to ignore environmental concerns that could be dealt with more easily at an early stage of the project" (*id.* at p. 395); (2) " 'environmental considerations do not become submerged by chopping a large project into many little ones — each with a minimal potential impact on the environment — which cumulatively may have disastrous consequences' [citation]"; and (3) "premature environmental analysis may be meaningless and financially wasteful" (*id.* at p. 396). We then concluded that UCSF's EIR had to address the potential effects of future use because there was "telling evidence" UCSF had, by the time it prepared the EIR, "either made decisions or formulated reasonably definite proposals as to future uses of the building." (*Id.* at p. 397.) We clarified, however, that an EIR need not discuss

42

"specific future action that is merely contemplated or a gleam in a planner's eye." (*Id.* at p. 398.)

We decline to extend *Laurel Heights I* to situations where project opponents claim, not that the proposed project will lead to additional future development, but that the proposed project cannot be carried out as approved and will require additional work that may or will have a significant environmental effect. The latter situation, unlike the former, presents little risk of either bureaucratic and financial impediments to proper environmental review or piecemeal review of a project with the potential for significant cumulative effects. As respondents argue, if a proposed project cannot be built as approved, then the project's proponents will have to seek approval of any additional activities and, at that time, will have to address the potential environmental effects of those additional activities. As respondents also argue, if a project opponent's opinion that *unapproved* activities may have a significant environmental effect constitutes fair argument, then it is doubtful that any project could survive challenge. Accordingly, Karp's opinion is insufficient as a matter of law insofar as it is based on the potential effect of unapproved activities Karp believes will be necessary because the project cannot be built as approved.

This conclusion has implications for respondents' claim that, because Karp misread the proposed project's plans, his opinion is legally insufficient. As part of the permit application, applicants submitted a set of architectural plans for the project. In opining that the proposed project would result in "oversteepened side-hill fills" with potentially significant environmental effects — including "seismic lurching" — Karp relied largely, if not entirely, on a page of those plans entitled "TRANSVERSE SECTION LOOKING EAST." In April 2010, during the appeal to the city council, Karp stated that this page "indicates [that] fills [will be] placed directly on very steep existing slopes," "creat[ing] a new slope more than 50º."

43

However, the plans the Board had already approved three months earlier (along with the use permit) did not include this page. Nor, as appellants concede, do the project plans the city council ultimately approved include this page.[8] Insofar as Karp thus based his opinion regarding the project's potential effects on side-hill fill that has not been approved, his opinion is legally insufficient.[9] On remand, the Court of Appeal should apply these principles to Karp's opinion should it reach that point in its analysis.[10]

Finally, because reversal and remand is appropriate for reasons explained above, we need not resolve respondents' claim that the remedy the Court of Appeal chose upon finding the proposed project not to be exempt under Class 3 or Class 32 — ordering preparation of an EIR — was improper. However, it is appropriate to discuss that issue because the question of remedy could arise again on remand.

Section 21168.9 specifically addresses the available remedies for CEQA violations. As here relevant, subdivision (a) provides that, upon finding that a

[8] In its resolution affirming the Board's decision, the city council stated: "[T]he Council hereby adopts . . . the project plans on Exhibit B." The page on which Karp relied does not appear in that exhibit.

[9] Based on other expert evidence before the city council — the letters from Kropp and Toby — respondents also assert that Karp misread the omitted page, and that what he identified on that page as side-hill fill is actually nothing more than the lot's current ground surface. In light of our conclusion, we need not address this argument.

[10] Respondents also argue that the "the probability of seismic lurching" Karp identified is an effect, not of the project, but of Berkeley's "existing earthquake-prone environment," and that application of the unusual circumstances exception may not be based on evidence of the existing environment's impact on a proposed project. In *California Building Industry Assn. v. Bay Area Air Quality Management Dist.* (review granted Nov. 26, 2013, S213478), we granted review to decide whether CEQA requires an analysis of how existing environmental conditions will impact future residents or users of a proposed project. Given this fact, and the other errors that require reversal and remand, we do not address this claim.

44

public agency's decision violates CEQA, a court should enter an order that includes (1) a mandate that the decision be voided in whole or in part, and/or (2) a mandate that the agency "take specific action as may be necessary to bring the . . . decision into compliance with" CEQA. (§ 21168.9, subd. (a)(1), (3).) Subdivision (b) states that any such order "shall be made by the issuance of a peremptory writ of mandate *specifying what action by the public agency is necessary to comply with* [CEQA]." (§ 21168.9, subd. (b), italics added.) Consistent with these provisions, we have ordered preparation of an EIR upon finding that a public agency had improperly issued a negative declaration for a proposed project (*Communities for a Better Environment v. South Coast Air Quality Management Dist.* (2010) 48 Cal.4th 310, 320), and upon finding that a certified EIR was inadequate (*Laurel Heights I*, *supra*, 47 Cal.3d at p. 388).

However, as respondents note, subdivision (c) of section 21168.9 provides in part that "[n]othing in this section authorizes a court to direct any public agency to exercise its discretion in any particular way." In *Voices*, *supra*, 209 Cal.App.4th at page 1113, the Court of Appeal held that, upon finding that an agency erred in applying a categorical exemption, the trial court had "exceeded its authority" in ordering the agency to prepare an EIR. "How an agency complies with CEQA," the Court of Appeal reasoned, "is a matter first left to the agency's discretion. Having determined the project was not exempt from CEQA, the court should have ordered [the agency] to proceed with further CEQA compliance, which in this case would have been the preparation of an initial study and a determination of whether further environmental review would require an EIR or a mitigated negative declaration." (*Ibid.*) Consistent with these authorities, if, on remand, the Court of Appeal determines that neither of the categorical exemptions discussed above applies, then it may order preparation of an EIR only if, under the

45

circumstances, the City would lack discretion to apply another exemption or to issue a negative declaration, mitigated or otherwise.

## III.  DISPOSITION

The Court of Appeal's judgment is reversed and the matter is remanded for further proceedings consistent with this opinion.

CHIN, J.

WE CONCUR:

CANTIL-SAKAUYE, C. J.
CORRIGAN, J.
BAXTER, J.*
BOREN, J.**

_____
*　　　Retired Associate Justice of the Supreme Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

**　　　Administrative Presiding Justice of the Court of Appeal, Second Appellate District, Division Two, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

**CONCURRING OPINION BY LIU, J.**

I agree with today's opinion that "a finding of environmental impacts must be based on the proposed project as actually approved and may not be based on unapproved activities that opponents assert will be necessary because the project, as approved, cannot be built." (Maj. opn., *ante*, at p. 42.) This rule will not lead to evasion of the environmental review requirements of the California Environmental Quality Act (CEQA) because presumably a developer's failure to build the project as approved will be remedied by the local agency that approved the project. Where opponents of a project make a credible argument that it cannot be built as approved, a trial court may exercise its discretion to retain continuing jurisdiction after rendering a judgment in order to ensure CEQA compliance. (See 2 Witkin, Cal. Procedure, Jurisdiction, § 420, pp. 1070–1071; *City of Pasadena v. City of Alhambra* (1949) 33 Cal.2d 908, 936 [court reserves jurisdiction to modify water rights judgment " 'in the event material change be found or any such abandonment or forfeiture be established' "].) In this case, because the trial court and Court of Appeal did not limit environmental review to projects actually approved, I agree that reversal and remand are warranted. (Maj. opn., *ante*, at pp. 41–44.)

I do not agree, however, with the court's reading of section 15300.2, subdivision (c) of the CEQA guidelines (Cal. Code Regs., tit. 14, § 15000 et seq.

1

(Guidelines)) or with the court's novel and unnecessarily complicated approach to the standard of review.  Section 15300.2, subdivision (c) (hereafter section 15300.2(c)) provides that a categorical exemption from CEQA review shall not apply when "there is a reasonable possibility that the activity will have a significant effect on the environment due to unusual circumstances."  The court says this language establishes two distinct requirements for section 15300.2(c)'s applicability:  (1) there must be a reasonable possibility the project will have significant environmental effects and (2) those effects must be due to unusual circumstances.  But, as explained below, a project falling within a categorical exemption is, by definition, a project belonging to a class of projects that does not have significant environmental effects.  (See Pub. Resources Code, § 21084, subd. (a).)  When there is a reasonable possibility that a project otherwise covered by a categorical exemption will have a significant environmental effect, it necessarily follows that the project presents unusual circumstances.  In other words, the reasonable possibility of a significant environmental effect *means* that some circumstance of the project is not usual in comparison to the typical project in the exempt category.  Instead of comprising a distinct requirement, the phrase "unusual circumstances" in section 15300.2(c) simply *describes* the nature of a project that, while belonging to a class of projects that typically have no significant environmental effects, nonetheless may have such effects.  The sole question for courts reviewing agency determinations under section 15300.2(c) is whether substantial evidence supports a fair argument that the project will have significant environmental effects.

It is unfortunate that today's opinion, instead of simplifying the law in accordance with the CEQA statute and guidelines, adds further complexity to an area that many courts, practitioners, and citizens already find difficult to navigate.  Nevertheless, I expect that after today's decision, as before, courts reviewing

2

agency determinations under section 15300.2(c) will be guided by that guideline's basic purpose, which echoes the statutory mandate: to ensure that projects with a reasonable possibility of significant environmental effects are not exempted from CEQA review.

## I.

The main purpose of environmental review under CEQA is to "identify the significant effects on the environment of a project" and to identify project alternatives and feasible mitigation measures. (Pub. Resources Code, § 21002.1, subd. (a); all statutory references are to this code unless otherwise indicated.) Consistent with that purpose, the Legislature created categorical exemptions and directed the Secretary of the Natural Resources Agency (the Secretary) to list classes of projects exempt from CEQA review. Section 21084, subdivision (a) (hereafter section 21084(a)) provides: "The guidelines prepared and adopted pursuant to Section 21083 shall include a list of classes of projects that *have been determined not to have a significant effect on the environment* and that shall be exempt from this division. In adopting the guidelines, the Secretary of the Natural Resources Agency shall make a finding that the listed classes of projects referred to in this section do not have a significant effect on the environment." (Italics added.) Thus, section 21084(a) instructs the Secretary to exempt from CEQA review only classes of projects that do not have a significant effect on the environment.

The exempt classes of projects listed by the Secretary stand in contrast to statutory exemptions created by the Legislature. The latter include certain kinds of affordable housing (§ 21159.23), certain high priority transit projects (§ 21155.1), and the construction of certain prisons (§§ 21080.01, 21080.02). The statutory exemptions are not based on any determination that the exempt projects will not have significant environmental effects. Instead, they are based on the

3

Legislature's determination that each of the exemptions "promote[s] an interest important enough to justify forgoing the benefits of environmental review." (*Napa Valley Wine Train, Inc. v. Public Utilities Com.* (1990) 50 Cal.3d 370, 382.) The categorical exemptions authorized by section 21084(a) are fundamentally different. They are not based on a judgment that certain categories of projects should be exempt despite their potential effect on the environment. They are based on a wholesale judgment that projects within the exempt category will not have significant environmental effects.

The fact that a categorical exemption reflects a wholesale judgment about a class of projects, and not an individual judgment about a particular project, gives rise to the interpretive question before us. A *class* of projects "determined not to have a significant effect on the environment" (§ 21084(a)) — for example, a single-family residence — may turn out to be overinclusive insofar as it includes some projects that fit the category but nevertheless may have significant environmental effects. How are such outliers to be treated under the CEQA scheme?

One approach would be to say that section 21084(a) permits such overinclusion because most projects in an exempt class will not have significant environmental effects and the efficiency gains of exempting the entire class outweigh the value of requiring CEQA review of the few projects in the class that may have significant effects. But neither the court nor any party has advanced this theory, and for good reason.

In *Wildlife Alive v. Chickering* (1976) 18 Cal.3d 190, 205–206 (*Chickering*), we said that "no regulation is valid if its issuance exceeds the scope of the enabling statute. [Citations.] The [S]ecretary is empowered to exempt only those activities which do not have a significant effect on the environment. (Pub. Resources Code, § 21084.) It follows that where there is any reasonable

4

possibility that a project or activity may have a significant effect on the environment, an exemption would be improper." Section 15300.2(c), promulgated shortly after *Chickering*, was an attempt to codify *Chickering* and its understanding of section 21084(a). A portion of section 15300.2's rulemaking file reproduced by appellants confirms this regulatory intent, and respondents do not suggest otherwise. (See 1 Kostka & Zischke, Practice Under the California Environmental Quality Act (2d ed. 2008) § 5.72, p. 5-62 (1 Kostka & Zischke) [§ 15300.2(c) "adopted to codify the court's ruling" in *Chickering* that the Secretary "may exempt only activities that do not have a significant effect on the environment"]; *Communities for a Better Environment v. California Resources Agency* (2002) 103 Cal.App.4th 98, 129 (*Communities for a Better Environment*) [§ 15300.2(c) exception to categorical exemptions was "based on the *Chickering* decision"].)

Section 15300.2(c) reads in full: "Significant Effect. A categorical exemption shall not be used for an activity where there is a reasonable possibility that the activity will have a significant effect on the environment due to unusual circumstances." This language is one of six provisions under the heading "Exceptions" in section 15300.2 of the CEQA guidelines. Like section 15300.2(c), each of the other five provisions makes the categorical exemptions authorized by section 21084(a) inapplicable to projects that, while belonging to an exempt class, have certain characteristics that raise environmental concerns. (See §§ 15300.2, subd. (a) [exception for "a project . . . ordinarily insignificant in its impact on the environment [that] may in a particularly sensitive environment be significant"], 15300.2, subd. (b) [exception for "successive projects of the same type in the same place" whose "cumulative impact . . . over time is significant"], 15300.2, subd. (d) [exception for "a project which may result in damage to scenic resources . . . within . . . a state scenic highway"], 15300.2, subd. (e) [exception for

5

a project located on a hazardous waste site], 15300.2, subd. (f) [exception for a project that may adversely affect a historical resource].)

This regulatory structure — categorical exemptions, with various exceptions to the exemptions — confirms that "a categorical exemption authorized by CEQA section 21084 is an exemption from CEQA for a *class* of projects that the Resources Agency determines will *generally* not have a significant effect on the environment." (*Communities for a Better Environment*, *supra*, 103 Cal.App.4th at p. 127; see *Azusa Land Reclamation Co. v. Main San Gabriel Basin Watermaster* (1997) 52 Cal.App.4th 1165, 1206 (*Azusa*) [a categorical exemption identifies "a class of activities that does not *normally* threaten the environment" (italics added)].) The CEQA guidelines anticipate the overinclusivity of categorical exemptions and address the problem by establishing a list of exceptions.

In construing section 15300.2(c), it is worth noting that the title of the provision is "Significant Effect." Hence I shall refer to section 15300.2(c) as the "significant effect exception." In calling section 15300.2(c) the "unusual circumstances exception," today's opinion ignores the title and places primary emphasis on a term that the provision itself does not emphasize.

As the court acknowledges, the term "unusual circumstances" first appeared in the context of CEQA review in *Friends of Mammoth v. Board of Supervisors* (1972) 8 Cal.3d 247 (*Friends of Mammoth*), and this usage is key to understanding section 15300.2(c). In *Friends of Mammoth*, we said that "common sense tells us that the majority of private projects for which a government permit or similar entitlement is necessary are minor in scope — e.g., relating only to the construction, improvement, or operation of an individual dwelling or small business — and hence, *in the absence of unusual circumstances*, have little or no effect on the public environment. Such projects, accordingly, may be approved

6

exactly as before the enactment of the [CEQA]." (*Id.* at p. 272, italics added.) We did not suggest that a finding of "unusual circumstances" was a prerequisite to CEQA review. Rather, we used that phrase in the course of acknowledging that private projects generally do not have significant effects on the environment, and so when they do, such effects will be due to unusual circumstances. Reading "unusual circumstances" in this straightforward manner squares section 15300.2(c) with both *Friends of Mammoth* and *Chickering*.

This understanding of "unusual circumstances" is restated in *Communities for a Better Environment*, *supra*, 103 Cal.App.4th 98, a case concerning the in-fill development exemption under section 15332 of the CEQA guidelines. In explaining that environmental effects not mentioned in section 15332, such as aesthetics or health and safety impacts, must be considered in determining the exemption's applicability, the court said: "These other environmental effects . . . would constitute 'unusual circumstances' under this exception for a project that otherwise meets the Guidelines section 15332 criteria. This is because a project that does meet the comprehensive environmentally protective criteria of section 15332 normally would not have other significant environmental effects; if there was a reasonable possibility that the project would have such effects, those effects would be 'unusual circumstances' covered by the section 15300.2, subdivision (c) exception." (*Communities for a Better Environment*, at p. 129.)

In sum, when there is a reasonable possibility of a significant environmental effect from a project belonging to a class that generally does not have such effects, the project necessarily presents "unusual circumstances," and section 15300.2(c) applies.

7

## II.

Today's opinion objects that this reading of section 15300.2(c) would result in categorically exempt projects being treated the same as nonexempt projects, thereby undermining the purpose of categorical exemptions. "Try as they might," the court says, "appellants can identify no purpose or effect of the categorical exemption statutes if, as they assert, a showing of potential environmental effect precludes application of all categorical exemptions." (Maj. opn., *ante*, at p. 16.) "[T]o establish the unusual circumstances exception, it is not enough for a challenger merely to provide substantial evidence that the project *may* have a significant effect on the environment, because that is the inquiry CEQA requires absent an exemption. (§ 21151.) Such a showing is inadequate to overcome the Secretary's determination that the typical effects of a project within an exempt class are not significant for CEQA purposes." (*Id.* at pp. 20–21.) The court is thus led to conclude that the term "due to unusual circumstances" sets forth a requirement separate and distinct from "a reasonable possibility of significant effects" in section 15300.2(c). In turn, the court devises a novel "bifurcated" standard of review that evaluates whether there is a reasonable possibility of a significant environmental effect under the fair argument standard, while evaluating whether significant effects are due to unusual circumstances under a deferential substantial evidence standard. (Maj. opn., *ante*, at pp. 34–37.) This approach, the court suggests, is necessary in order to treat categorically exempt projects differently from nonexempt projects and thereby realize the purpose of categorical exemptions.

But the major premise of the court's reasoning is faulty, for there are two reasons why it is not true that categorical exemptions would have no value if we interpret section 15300.2(c) to apply whenever there is a reasonable possibility of significant environmental effects.

8

First, when an agency has determined that a project falls within an exempt category, the project enjoys a considerable procedural advantage. For any project not covered by a categorical or other exemption, the reviewing agency has the burden of conducting an initial study into whether the project will have significant environmental effects. (See Guidelines, § 15063, subd. (a).) The project may proceed without further environmental review only if the agency issues a negative declaration identifying the project's environmental effects and explaining why they are not significant. (See *id.*, § 15063, subd. (b)(2); 1 Kostka & Zischke, *supra*, § 6.2, pp. 6-6 to 6-7.) Notice and public review and comment are required of a negative declaration, and an agency must consider comments and potentially modify its conclusions in response to those comments. (See 1 Kostka & Zischke, *supra*, §§ 7.10, pp. 7-9 to 7-10; 7.19, pp. 7-16 to 7-17.)

By contrast, an agency finding that a project falls into an exempt category need not follow any particular procedure nor include any written determination, and the agency need not undertake an initial study or adopt a negative declaration. (See 1 Kostka & Zischke, *supra*, § 5.114, pp. 5-100 to 5-101.) When an agency finds that a project is subject to a categorical exemption, it impliedly finds that it has no significant environmental effect, and the burden shifts to the challengers of the proposed project to produce evidence that the project will have a significant effect. (*Id.* at § 5.71, pp. 5-61 to 5-62 and cases cited therein.) Once an agency finds a project categorically exempt, it is the project opponent's burden to produce evidence that the significant effect exception applies.

This procedural advantage should not be underestimated. In many cases, categorical exemptions are not litigated, and the applicability of the exemption is evident. In the mine run of cases, the efficiency gains of sparing the agency the task of conducting an initial study and issuing a negative declaration provide a strong policy justification for categorical exemptions. Moreover, as is generally

9

true of burden allocations in the law, in cases where an exemption's applicability presents a close issue, requiring the challenger to show the reasonable possibility of a significant effect, instead of requiring the agency to show no such effects, can be determinative.

The court says this procedural advantage is "largely illusory" because "an agency may not apply a categorical exemption without considering evidence in its files of potentially significant effects, regardless of whether that evidence comes from its own investigation, the proponent's submissions, a project opponent, or some other source." (Maj. opn., *ante*, at p. 18.) But an agency's obligation to consider evidence in its files of potentially significant effects can hardly be equated with an agency's obligation, in the case of a nonexempt project, to undertake an initial study of the project's environmental effects, to solicit and consider public comments on the study, and to issue a negative declaration explaining why potential environmental impacts would not be significant. The procedural burdens falling on agencies when they review nonexempt projects are considerably greater than when they review categorically exempt projects. The court's suggestion to the contrary will certainly come as news to the agencies that undertake these different review procedures.

Moreover, an agency finding that a project falls into an exempt category confers a second advantage. As the court observes, the Secretary had to interpret the meaning of "significant effects" in order to identify classes of projects with no significant effects pursuant to section 21084(a). The Secretary's designation of an exempt category reflects a judgment that projects in the category typically do not have significant environmental effects, and this judgment is entitled to considerable weight. When an opponent seeks to subject such a project to CEQA review, the proponent can make two *comparative* arguments (assuming they are supported by evidence) that are unavailable in the case of a nonexempt project.

10

First, the proponent can argue that the project's effects are typical of the effects generated by projects in the exempt category, such that few or no projects in the category would be exempt if the effects were deemed significant.  Second, the proponent can argue that the project's dimensions or features are not unusual compared to typical projects in the exempt category, thereby suggesting that the project is similar to those that the Secretary has determined not to have a significant environmental effect.  The availability of these arguments shows that the phrase "due to unusual circumstances" is not "meaningless surplusage."  (Maj. opn., *ante*, at p. 20.)  Such arguments make it more likely that a project belonging to an exempt category will be able to bypass the environmental review that would otherwise be required in the absence of any categorical exemption.  (See, e.g., *San Francisco Beautiful v. City and County of San Francisco* (2014) 226 Cal.App.4th 1012, 1025 (*San Francisco Beautiful*); *Fairbank v. City of Mill Valley* (1999) 75 Cal.App.4th 1243, 1260 (*Fairbank*); *Association for Protection of Environmental Values in Ukiah v. City of Ukiah* (1991) 2 Cal.App.4th 720, 736 (*Ukiah*).

The court says this advantage is also "illusory" because "evidence a project proponent offers to show that the project will only have typical effects, dimensions, and features is *irrelevant* if a project opponent can make a mere fair argument that those effects, dimensions, or features are not typical, or that the project will have a significant environmental effect."  (Maj. opn., *ante*, at p. 19.)  But evidence of typicality is surely relevant to *whether* a project opponent can make a fair argument of atypical features or significant effects.  This is confirmed by the cases just cited (*San Francisco Beautiful*, *Fairbank*, and *Ukiah*), each of which relies on such comparative arguments in finding no substantial evidence of a fair argument of significant effects.  The court nowhere suggests these cases erred in their reasoning or results.  The fact that comparative arguments may not

11

always defeat a fair argument of significant effects does not negate their value in the cases where they do.

Today's opinion also contends that my reading of section 15300.2(c) puts a project proponent who claims a categorical exemption in the same position as the proponent of a nonexempt project who claims the common sense exemption in Guidelines section 15061, subdivision (b)(3). (Maj. opn., *ante*, at p. 17.) But the common sense exemption is available only when the agency, based on the record evidence, meets its burden of demonstrating "*with certainty* that there is *no possibility* that the activity in question may have a significant effect on the environment.*" (Guidelines, § 15061, subd. (b)(3), italics added; see *Muzzy Ranch Co. v. Solano County Airport Land Use Com.* (2007) 41 Cal.4th 372, 386–387.) This exacting requirement exceeds an agency's obligation, before applying a categorical exemption, to consider the evidence in its files and preliminarily rule out a *reasonable* possibility of significant effects. Indeed, if an agency could apply the common sense exemption to a project not covered by a categorical exemption simply by making a preliminary determination based on evidence in its files that there is no reasonable possibility of significant effects, then the common sense exemption would swallow the general rule that an agency must conduct an initial study to determine whether a project not covered by a categorical exemption will have significant effects. (See Guidelines, § 15063, subd. (a).)

An agency may find that a project falls within a categorical exemption without first making an express or definitive finding that no section 15300.2 exception applies; the burden is on the party challenging the categorical exemption to show that an exception applies. (*Committee to Save Hollywoodland Specific Plan v. City of Los Angeles* (2008) 161 Cal.App.4th 1168, 1186–1187.) In addition, project proponents seeking to invoke a categorical exemption may employ comparative arguments that are not available to project proponents

12

seeking to invoke the common sense exemption. Thus, the availability of the common sense exemption for projects meeting its narrow standard of "certainty" does not negate the advantages that a categorical exemption confers.

The court is thus mistaken that the categorical exemption statutes have "no purpose or effect . . . if . . . a showing of potential environmental effect precludes application of all categorical exemptions." (Maj. opn., *ante*, at p. 16.) Without this erroneous premise, there is no reason to construe "due to unusual circumstances" as an independent requirement in section 15300.2(c) or to adopt a separate standard of review for the determination of "unusual circumstances." As explained above, this approach is at odds with section 15300.2(c)'s origins in *Chickering* and *Friends of Mammoth*. Section 15300.2(c) affirms the principle that "where there is any reasonable possibility that a project or activity may have a significant effect on the environment, an exemption would be improper." (*Chickering*, *supra*, 18 Cal.3d at p. 206.) And just as a project belonging to an exempt class will have no significant effects "in the absence of unusual circumstances" (*Friends of Mammoth*, *supra*, 8 Cal.3d at p. 272), a project that may have significant effects, despite belonging to an exempt class, is necessarily a project that presents unusual circumstances. The only question for a court reviewing an agency's section 15300.2(c) determination is whether substantial evidence supports a fair argument that the project will have significant environmental effects. (See *Friends of "B" Street v. City of Hayward* (1980) 106 Cal.App.3d 988, 1002.) It need not be more complicated than that.

Today's decision ventures a panoply of reasons why *Chickering* should not be read to mean what it says, including the opaque contention that *Chickering*'s interpretation of section 21084(a) somehow violates "the Legislature's express directive in section 21083.1 'not [to] interpret' the CEQA statutes *and the Guidelines* 'in a manner which imposes procedural or substantive requirements beyond those' the

13

statutes *and the Guidelines* 'explicitly state[].' " (Maj. opn., *ante*, at p. 24.) But the court's reluctance to follow *Chickering* is ultimately based not on the language or legislative history of section 21084(a), but on the premise that reading section 21084(a) and section 15300.2(c) in harmony with *Chickering* would deprive categorical exemptions of any purpose or effect. Because this premise is flawed, so is the court's haphazard effort to minimize *Chickering*'s simple and sensible reading of section 21084(a).

### III.

It is true that over the years, the Courts of Appeal have divided on whether "unusual circumstances" and "significant effects" are distinct requirements in section 15300.2(c). However, when one examines the reasoning of the many cases applying section 15300.2(c), it is clear that "unusual circumstances" and "significant effects" have invariably traveled together. In the nearly four decades since section 15300.2(c) was adopted, no published case has ever found or even hinted that a project that belongs to an exempt category yet has a reasonable possibility of significant environmental effects may nonetheless evade CEQA review on the ground that the effects are not due to unusual circumstances. The only court on record to have reached such a conclusion is the trial court in this case. But, as today's opinion suggests, that conclusion is unlikely to stand. The absence of case law finding a reasonable possibility of significant effects but no unusual circumstances further confirms that section 15300.2(c) boils down to one inquiry, not two.

Indeed, most courts applying section 15300.2(c) have focused directly on whether there is a reasonable possibility that the project will have significant environmental effects. (See, e.g., *North Coast Rivers Alliance v. Westlands Water Dist.* (2014) 227 Cal.App.4th 832, 871–874 [finding no evidence of possible

14

significant environmental effects while assuming without deciding that there were "unusual circumstances"]; *Banker's Hill, Hillcrest, Park West Community Preservation Group v. City of San Diego* (2006) 139 Cal.App.4th 249, 278–281 [rejecting application of the exception on the ground that there were no significant environmental effects]; *San Lorenzo Valley Community Advocates for Responsible Education v. San Lorenzo Valley Unified School Dist.* (2006) 139 Cal.App.4th 1356, 1392–1394 (*San Lorenzo*) [no substantial evidence of significant environmental effects]; *Santa Monica Chamber of Commerce v. City of Santa Monica* (2002) 101 Cal.App.4th 786, 800–801 (*Santa Monica*) [only effects of adopting a new preferred parking zone were socioeconomic, not environmental, and therefore not cognizable under CEQA]; *Apartment Assn. of Greater Los Angeles v. City of Los Angeles* (2001) 90 Cal.App.4th 1162, 1175–1176 [insufficient evidence of significant effects]; *City of Pasadena v. State of California* (1993) 14 Cal.App.4th 810, 827–834 [rejecting various arguments that a parole office located in downtown Pasadena would have significant environmental effects]; *Centinela Hospital Assn. v. City of Inglewood* (1990) 225 Cal.App.3d 1586, 1601 (*Centinela*) [substantial evidence supported finding of no significant environmental effect]; *McQueen v. Board of Directors* (1988) 202 Cal.App.3d 1136, 1149 [known existence of hazardous materials on the property threatening the environment brings the project within the exception].)

Among cases that have focused on "unusual circumstances," it is evident that courts have treated unusual circumstances as a proxy for significant effects. In *Wollmer v. City of Berkeley* (2011) 193 Cal.App.4th 1329, 1350–1352, for example, the court titled one part of its opinion "No Unusual Circumstances Preventing Categorical Exemption" and then proceeded to find no substantial evidence of potential significant environmental effects. In *Voices for Rural Living v. El Dorado Irrigation Dist.* (2012) 209 Cal.App.4th 1096, 1108–1113, the court

15

concluded that a casino requiring a high volume of water usage was an unusual circumstance for a project within the "small facilities" exemption, and it then proceeded to find that such high-volume water usage presented the potential for significant environmental risks. Other courts have employed similar reasoning. (See *Bloom v. McGurk* (1994) 26 Cal.App.4th 1307, 1315–1316 ["existing facilities" exemption applied to medical waste facility, and there were no "unusual circumstances" because the facility was located in an area zoned for heavy industry and not adjacent to a residential area that might be adversely affected by such a facility]; *Azusa*, *supra*, 52 Cal.App.4th at p. 1207 [finding landfill "unusual" because it overlay a major drinking water aquifer and presented a substantial risk of pollution].) Again, it appears that no court, other than the trial court here, has ever found a reasonable possibility of significant effects while also finding that the effects were not due to unusual circumstances.

As for the proper standard of review, many courts have held that the fair argument test applies. (Maj. opn., *ante*, at pp. 32–33 [citing cases].) One older case has disagreed, holding that section 15300.2(c) does not apply if there is substantial evidence supporting the agency's conclusion that the project will not generate significant effects. (*Centinela*, *supra*, 225 Cal.App.3d at p. 1601.) As today's opinion notes, "[o]ther courts have noted judicial disagreement as to whether the fair argument standard applies in this context, but have declined to decide the issue, finding that the standard's application would not have affected the result." (Maj. opn., *ante*, at p. 33, citing *Save the Plastic Bag Coalition v. City and County of San Francisco* (2013) 222 Cal.App.4th 863, 879; *Hines v. California Coastal Commission* (2010) 186 Cal.App.4th 830, 855; *San Lorenzo*, *supra*, 139 Cal.App.4th at p. 1390; *Santa Monica*, *supra*, 101 Cal.App.4th at p. 796; *Fairbank*, *supra*, 75 Cal.App.4th at pp. 1259–1260; *Ukiah*, *supra*, 2 Cal.App.4th at p. 728, fn. 7.) In each of these cases, the court found no substantial

16

evidence supporting a fair argument that the project would have significant environmental effects.

Thus, courts have overwhelmingly used the fair argument standard in reviewing the applicability of the significant effect exception either because they believed it was the appropriate standard or because they assumed it was. For more than two decades, courts have not felt the need to resolve the question of the proper standard because the fair argument standard has proven adequate to the task of ferreting out bogus CEQA challenges that would subject categorically exempt projects to unnecessary environmental review. The ultimate touchstone of all of these courts' inquiries has been whether there is a reasonable possibility that the project would have significant environmental effects.

Today's opinion observes that "evidence that the project *will* have a significant effect *does* tend to prove that some circumstance of the project is unusual." (Maj. opn., *ante*, at p. 21.) This observation, though understating the real relationship between "significant effects" and "unusual circumstances," authorizes courts applying section 15300.2(c) to continue reasoning the way they have been doing for years — i.e., focusing their inquiry on whether there is a reasonable possibility that the project will have significant environmental effects. Indeed, before a project has been subject to environmental review, the only thing that courts are generally positioned to assess with confidence is whether there is a *reasonable possibility* of significant environmental effects. (See *No Oil, Inc. v. City of Los Angeles* (1974) 13 Cal.3d 68, 84–85.) Even under the cumbersome rules set forth today, it is hard to imagine that any court, upon finding a reasonable possibility of significant effects under the fair argument standard, will ever be compelled to find no unusual circumstances and thereby uphold the applicability of a categorical exemption. Rather, courts may continue to affirm in practice what we have stated as a simple principle: "where there is any reasonable

17

possibility that a project or activity may have a significant effect on the environment, an exemption would be improper." (*Chickering*, *supra*, 18 Cal.3d at p. 206.)

Although I join the court in reversing and remanding for further proceedings, I would hold that the Court of Appeal did not err in its reading of section 15300.2(c).

**LIU, J.**

**I CONCUR:**

**WERDEGAR, J.**

18

*See last page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** Berkeley Hillside Preservation v. City of Berkeley
_____

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding**
**Review Granted** XXX 203 Cal.App.4th 656
**Rehearing Granted**

_____

**Opinion No.** S201116
**Date Filed:** March 2, 2015
_____

**Court:** Superior
**County:** Alameda
**Judge:** Frank Roesch

_____

**Counsel:**

Brandt-Hawley Law Group and Susan Brandt-Hawley for Plaintiffs and Appellants.

Michael W. Graf for Center for Biological Diversity and High Sierra Rural Alliance as Amici Curiae on behalf of Plaintiffs and Appellants.

Chatten-Brown & Carstens, Jan Chatten-Brown, Douglas P. Carstens; Law Offices of Michael W. Stamp, Michael W. Stamp and Molly Erickson for Planning and Conservation League, Endangered Habitats League, Inc., California Preservation Foundation, Save Our Heritage Organisation, Save Our Carmel River and The Open Monterey Project as Amici Curiae on behalf of Plaintiffs and Appellants.

Veneruso & Moncharsh and Leila H. Moncharsh for Berkley Architectural Heritage Association as Amicus Curiae on behalf of Plaintiffs and Appellants.

Zach Cowan, City Attorney, and Laura McKinney, Deputy City Attorney, for Defendants and Respondents.

Perkins Coie, Stephen L. Kostka and Barbara J. Schussman for Building Industry Association of the Bay Area as Amicus Curiae on behalf of Defendants and Respondents.

Downey Brand, Christian L. Marsh, Andrea P. Clark and Graham St. Michel for Association of California Water Agencies as Amicus Curiae on behalf of Defendants and Respondents.

Meyers, Nave, Riback, Silver & Wilson, Amrit S. Kulkarni and Julia L. Bond for Real Parties in Interest and Respondents.

Cox, Castle & Nicholson, Michael H. Zischke and Andrew B. Sabey for California Building Industry Association, California Business Properties Association and Building Industry Legal Defense Foundation as Amici Curiae on behalf of Defendants and Respondents and Real Parties in Interest and Respondents.

**Page 2 – S20116 – counsel continued**

**Counsel:**

Lozano Smith, Harold M. Freiman, Kelly M. Rem; Charles F, Robinson and Kelly L. Drumm for California School Boards Association's Education Legal Alliance, The Regents of the University of California and The Board of Trustee of the California State University as Amici Curiae on behalf of Defendants and Respondents and Real Parties in Interest and Respondents.

M. Reed Hopper for Pacific Legal Foundation as Amicus Curiae on behalf of Defendants and Respondents and Real Parties in Interest and Respondents.

Holland & Knight, Amanda Monchamp and Melanie Sengupta for League for California Cities and California State Association of Counties as Amici Curiae on behalf of Defendants and Respondents and Real Parties in Interest and Respondents.

Kamala D. Harris, Attorney General, Sally Magnani, Assistant Attorney General, Janill Richards and Catherine M. Wieman, Deputy Attorneys General, as Amici Curiae.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Susan Brandt-Hawley
Brandt-Hawley Law Group
P.O. Box 1659
Glen Ellen, CA  95442
(707) 938-3900

Amrit S. Kulkarni
Meyers, Nave, Riback, Silver & Wilson
555 12th Street, Suite 1500
Oakland, CA  94607
(510) 808-2000