Filed 11/13/23

# CERTIFIED FOR PUBLICATION

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

# SECOND APPELLATE DISTRICT

# DIVISION SIX

| | |
|---|---|
| CALIFORNIA CONSTRUCTION AND INDUSTRIAL MATERIALS ASSOCIATION, | 2d Civ. No. B320153 (Super. Ct. No. 56-2019-00527805) (Ventura County) |
| Plaintiff and Appellant, | |
| v. | |
| COUNTY OF VENTURA, | |
| Defendant and Respondent; | |
| LOS PADRES FORESTWATCH et al. | |
| Interveners and Respondents. | |
| VENTURA COUNTY COALITION OF LABOR, AGRICULTURE AND BUSINESS, | 2d Civ. No. B320174 (Super. Ct. No. 56-2019-00527815) (Ventura County) |
| Plaintiff and Appellant, | |
| v. | |

COUNTY OF VENTURA,

    Defendant and Respondent;

LOS PADRES FORESTWATCH
et al.

    Interveners and Respondents.

Here we decide that a county ordinance creating a wildlife migration corridor does not violate the Surface Mining and Reclamation Act or the California Environmental Quality Act.

The California Construction and Industrial Materials Association and the Ventura County Coalition of Labor, Agriculture and Business (Project Opponents) separately petitioned for writs of mandate to require the County of Ventura (County) to vacate an ordinance (the Project) creating overlay zones to protect wildlife migration corridors in rural portions of the County.

The Project Opponents claim the Project violates the Surface Mining and Reclamation Act of 1975 (SMARA) (Pub. Res. Code,[1] § 2710 et seq.) and the California Environmental Quality Act (CEQA) (§ 21000 et seq.).  The trial court denied the petitions.

We consolidate the appeals and affirm.

---

[1] All statutory references are to the Public Resources Code unless otherwise indicated.

FACTS

*Permitting Prior to the Project*

Prior to the adoption of the Project, the County's non-coastal zoning ordinance required a conditional use permit (CUP) for all mineral resource development.

The County's general plan required that to obtain a CUP the applicant must show among other matters: the proposed development is consistent with the County's general plan and ordinances; the proposed development will not be obnoxious or harmful; the proposed development will not be detrimental to the public interest, health, safety, convenience, or welfare; and the proposed development complies with CEQA and all other applicable laws.

The general plan also stated the policy that "[a]pplications for mineral resource development shall be reviewed to assure minimal disturbance to the environment . . . ." The general plan includes a specific policy for the preservation of wildlife migration corridors.

*The Project*

Prior to the Project, the County had no standards or regulations specifically governing wildlife movement corridors. Wildlife movement issues were decided through the County's discretionary permitting process and environmental review.

The Project is a County ordinance creating two overlay zones designed to preserve corridors that allow wild animals to move freely throughout the zones. The overlay zones cover approximately 163,000 acres of less developed areas of the County.

The first overlay zone is entitled "Habitat Connectivity and Wildlife Corridors Overlay Zone." It provides:

3

"The general purposes of Habitat Connectivity and Wildlife Corridors overlay zone are to preserve functional connectivity for wildlife and vegetation throughout the overlay zone by minimizing direct and indirect barriers, minimizing loss of *vegetation* and habitat fragmentation and minimizing impacts to those areas that are narrow, impacted or otherwise tenuous with respect to wildlife movement.  More specifically, the purposes of the Habitat Connectivity and Wildlife Corridors overlay zone include the following:

"a. Minimize the indirect impacts to wildlife created by outdoor lighting, such as disorientation of nocturnal species and the disruption of mating, feeding, migrating, and the predator-prey balance.

"b. Preserve the functional connectivity and habitat quality of surface water features, due to the vital role they play in providing refuge and resources for wildlife.

"c. Protect and enhance wildlife crossing structures to help facilitate safe wildlife passage.

"d. Minimize the introduction of invasive plants, which can increase fire risk, reduce water availability, accelerate erosion and flooding, and diminish biodiversity within an ecosystem.

"e. Minimize wildlife impermeable fencing, which can create barriers to food and water, shelter, and breeding access to unrelated members of the same species needed to maintain genetic diversity."  (Italics omitted.)

The second overlay zone is entitled "Critical Wildlife Passage Areas Overlay Zone."  It provides:  "There are three critical wildlife passage areas that are located entirely within the boundaries of the larger Habitat Connectivity and Wildlife Corridors overlay zone.  These areas are particularly critical for

4

facilitating wildlife movement due to any of the following: (1) the existence of intact native habitat or other habitat with important beneficial values for wildlife; (2) proximity to water bodies or ridgelines; (3) proximity to critical roadway crossings; (4) likelihood of encroachment by future development which could easily disturb wildlife movement and plant dispersal; or (5) presence of non-urbanized or underdeveloped lands within a geographic location that connects core habitats at the regional scale."

The Project also amends the County's general plan and other ordinances to carry out its purpose.

The state geologist sent the County two letters opining that SMARA requires a statement of reasons for permitting a "proposed use" that would threaten the potential to export minerals in designated areas. (§ 2762, subd. (d)(1).)[2] The County refused to do so on the ground that SMARA's requirement for a statement of reasons does not apply to the Project.

---

[2] Section 2762, subdivision (d)(1): "If an area is classified by the State Geologist as an area described in paragraph (2) of subdivision (b) of Section 2761 and the lead agency either has designated that area in its general plan as having important minerals to be protected pursuant to subdivision (a), or otherwise has not yet acted pursuant to subdivision (a), then prior to permitting a use that would threaten the potential to extract minerals in that area, the lead agency shall prepare, in conjunction with preparing, if required, an environmental document required by Division 13 (commencing with Section 21000), a statement specifying its reasons for permitting the proposed use, and shall forward a copy to the State Geologist and the board for review."

The Project Opponents brought separate petitions for a writ of mandate ordering the County to set aside its approval of the Project and to comply with SMARA, CEQA, and the CEQA guidelines (Guidelines).[3] They also sought a declaration that the County violated SMARA, CEQA, and the Guidelines in approving the Project.

The County opposed the petitions on the grounds that 1) SMARA does not apply; 2) if SMARA applies, the Project Opponents have failed to show prejudice from the failure to comply; and 3) the Project is exempt from CEQA.

The trial court consolidated the petitions for the purpose of the administrative record only. The court found for the County and denied both petitions. The Project Opponents appealed.

## DISCUSSION

### *I. SMARA*

The Project Opponents contend the County violated SMARA.

In 1982 the State Mining and Geology Board designated 10 sectors within the County as areas of regionally significant mineral resources. (§ 2761, subd. (b)(2).) Section 2762, subdivision (d)(1), provides in part, "[P]rior to permitting a use that would threaten the potential to extract minerals in [a designated] area, the lead agency shall prepare . . . a statement

---

[3] The administrative regulations implementing CEQA, which are authorized by section 21083, are set forth in the California Code of Regulations, title 14, section 15000 et seq. All references to "Guidelines" are to those administrative regulations.

specifying its reasons for permitting the proposed use, and shall forward a copy to the State Geologist and the board for review."

The County argues it was not required to comply with the subdivision because it was not "permitting a use" and the Project would not "threaten the potential to extract minerals." (§ 2762, subd. (d)(1).)

The meaning of "permitting a use" is a question of statutory interpretation that we review de novo. (*Cleveland National Forest Foundation v. County of San Diego* (2019) 37 Cal.App.5th 1021, 1041.) In ascertaining the Legislature's intent, we begin with the words of the statute, assigning them their ordinary meaning. (*Ibid*.) If the words of the statute are not ambiguous, the plain meaning governs. (*Ibid*.) The meaning of "permitting a use" is a question of first impression.

The trial court interpreted "permitting a use" broadly to include changes in permitting requirements. The court concluded that, under its interpretation, the Project is governed by SMARA.

We presume that had the Legislature intended section 2762 to include changes in permitting requirements, it would have said so. We also presume that when the Legislature said "permitting a use," it meant what it said. It did not mean simply changing permitting requirements that may have the potential for changing what uses are permitted.

The Project Opponents argue that the Project permits a "use," namely a wildlife corridor. But the use is by wildlife. We are confident that wildlife is loath to seek permission from the County. It pretty much goes where it will. The Project sets standards for future developments that might interfere with the movement of wildlife. That is not permitting a use.

7

That the state geologist sent two letters to the County opining that the County must issue a statement of reasons is irrelevant. The plain wording of section 2762 does not require a statement of reasons.

In any event, the Project Opponents are seeking traditional mandate. Traditional mandate requires that the petitioner show prejudice resulting from the public agency's action. (*California Public Records Research, Inc. v. County of Stanislaus* (2016) 246 Cal.App.4th 1432, 1449.) To show prejudice, the Project Opponents must show it is reasonably probable that they would have obtained a more favorable result in the absence of the alleged error. (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 574.)

The reason for the Project is stated in the ordinance itself: "[T]o preserve *functional connectivity* for wildlife and *vegetation* throughout the overlay zone." The public had ample opportunity to comment on the Project through the legislative process. The Project Opponents commented on the Project; so did numerous other members of the public. The state geologist was aware of the Project and commented that it threatens the extraction of mineral resources. The County was well aware of the comments by members of the public and the position taken by the state geologist when it approved the Project. Even had the County given the state geologist a formal statement of reasons, nothing in SMARA gives the state geologist the power to stop or modify the Project. Nothing in the record shows it is reasonably probable that the Project Opponents would have obtained a more favorable result had the County issued a statement of reasons.

## II. CEQA

### Statutory Background

The first step in an environmental analysis is to determine whether an activity qualifies as a "project" within the meaning of CEQA. Not everything a local agency decides to do is a project subject to CEQA. CEQA generally applies "to discretionary projects proposed to be carried out or approved by public agencies." (§ 21080, subd. (a).) It is undisputed that the Project at issue here qualifies as a project within the meaning of CEQA.

If an activity is determined to be a project, the next phase of inquiry is to determine whether the project is exempt from CEQA. Our Legislature has created a number of statutory exemptions (§ 21080, subd. (b)) and has directed the Secretary of the Natural Resources to create further exemptions for projects that have been determined not to have a significant impact on the environment (§ 21084, subd. (a); see Guidelines, § 15300 et seq.)

Exemptions created by such regulations are called "categorical exemptions." (Guidelines, § 15354.) In addition to statutory and categorical exemptions, there is a "common sense" exemption "[w]here it can be seen with certainty that there is no possibility that the activity in question may have a significant effect on the environment." (*Id.*, § 15061, subd. (b)(3).)

Where a project is found to be exempt from CEQA, no further environmental review is necessary. (*Muzzy Ranch Co. v. Solano County Airport Land Use Com.* (2007) 41 Cal.4th 372, 380.) If a project is not exempt, environmental review must proceed. (*Id.* at pp. 380-381.)

9

*Exemptions*

Here, in approving the Project, the County relied on the "common sense" exemption and Classes 7 and 8 categorical exemptions.

"Class 7 consists of actions taken by regulatory agencies as authorized by state law or local ordinance to assure the maintenance, restoration, or enhancement of a natural resource where the regulatory process involves procedures for protection of the environment. Examples include but are not limited to wildlife preservation activities of the State Department of Fish and Game. Construction activities are not included in this exemption." (Guidelines, § 15307.)

"Class 8 consists of actions taken by regulatory agencies, as authorized by state or local ordinance, to assure the maintenance, restoration, enhancement, or protection of the environment where the regulatory process involves procedures for protection of the environment. Construction activities and relaxation of standards allowing environmental degradation are not included in this exemption." (Guidelines, § 15308.)

In reviewing an agency's decision that a project is within a categorical exemption, we determine only whether the decision is supported by substantial evidence. (*Aptos Residents Assn. v. County of Santa Cruz* (2018) 20 Cal.App.5th 1039, 1046.)

There can be no rational dispute that the Project qualifies as an action taken by the County to "assure the maintenance, restoration or enhancement of a natural resource." (Guidelines, § 15307.) Nor can it be disputed that the Project involves "procedures for the protection of the environment." (Guidelines, § 15308.) The Project falls squarely within the plain language of the Classes 7 and 8 exemptions.

There is more than ample evidence to support the finding of an exemption.  The evidence includes studies and other documents citing the need to preserve wildlife corridors and the establishment of development standards compatible with wildlife movement, as well as preservations by experts.

The Project Opponents argue that the Project does not assure the protection of the environment because it may have adverse impacts.  They speculate that if local mining is prohibited, necessary building materials such as rock aggregate may need to be transported from a distant area, thus increasing pollution created by the transportation.

But nothing in the language of the Project prohibits the extraction of minerals.  Speculation that it could have that effect is not evidence.  Even if such speculation could be considered evidence, the substantial evidence rule would require that we treat the evidence as lacking verity.  (*GHK Associates v. Mayer Group, Inc.* (1990) 224 Cal.App.3d 856, 872.)

Moreover, the language of the exemptions does not require the agency to show its project assures the protection of the entire environment.  The plain language of the Class 7 exemption only requires the agency to show the Project assures the protection of "a natural resource."  (Guidelines, § 15307.)  The County has abundant evidence to support that finding.  Wildlife is "a natural resource" that is entitled to protection.  (See Guidelines, Appen. G, § IV subd. (d) [providing a checklist of factors to consider the environmental impacts of a project including whether the project will "[i]nterfere substantially with the movement of any native resident or migratory fish or wildlife species or with established native resident or migratory wildlife corridors, or impede the use of native wildlife nursery sites"].)

11

The Project Opponents' reliance on *Wildlife Alive v. Chickering* (1976) 18 Cal.3d 190 (*Wildlife Alive*) is misplaced. There a wildlife protection association petitioned for a writ of mandate requiring the Fish and Game Commission to suspend the black bear hunting season because the commission failed to prepare an environmental impact report. In opposition, amicus curiae argued that the hunting program came with a categorical exemption with wording similar to the present Classes 7 and 8 exemptions. Our Supreme Court rejected the amicus argument stating, "[W]here there is any reasonable possibility that a project or activity may have a significant effect on the environment, an exemption would be improper." (*Id.* at p. 206.)

*Wildlife Alive* was disapproved in *Berkley Hillside Preservation v. City of Berkley* (2015) 60 Cal.4th 1086, 1106-1109 (*Berkley Hillside*). There the city granted a permit to construct a 6,478-square-foot house with a 10-car garage on a steep slope. The city found that the project was exempt from CEQA as a single family residence in a residential zone (Class 3; Guidelines, § 15303) and an in-fill development (Class 32; Guidelines, § 15332). Opponents of the project claimed that all they needed to defeat the exemption was a fair argument that the project would have a potentially significant environmental effect. In rejecting the opponents' argument, our Supreme Court stated: "[T]he Legislature, through the Guidelines, intended to enumerate classes of projects that *are* exempt from CEQA because, notwithstanding their *potential* effect on the environment, they already 'have been determined not to have a significant effect on the environment.' (§ 21084, subd. (a).) The Guidelines implement this intent, by setting forth the 'classes of projects' that the Secretary, acting '[i]n response to the [the

12

Legislature's] mandate,' 'has found . . . do not have a significant effect on the environment.' (Guidelines, § 15300.)." (*Id.* at p. 1102.)

To defeat the categorical exemption, opponents must show more than a fair argument that the Project may have a significant environmental effect. (*Berkley Hillside, supra*, 60 Cal.4th at p. 1102.) Parties who oppose a categorically exempt project because it will have a potentially significant environmental effect must show it qualifies for an exception under Guidelines section 15300.2. (*Ibid.*)

*Exception to Exemptions*

Guidelines section 15300.2, subdivision (c), provides: "A categorical exemption shall not be used for an activity where there is reasonable possibility that the activity will have a significant effect on the environment due to unusual circumstances." " 'Significant effect on the environment' means a substantial or potentially substantial, *adverse* change in the environment." (§ 21068, italics added.)

A party challenging the exemption has the burden of producing evidence supporting an exception. (*Berkley Hillside, supra*, 60 Cal.4th at p. 1105.) The challenge must show both that: 1) there is a reasonable possibility that the activity will have a significant effect on the environment; and 2) the effect is due to unusual circumstances. (*Id.* at pp. 1097-1098.) In deciding whether an exemption applies, an agency must also consider whether an exception to the exemption applies under Guidelines section 15300.2. (*Berkley Hillside*, at p. 1103.)

As to the existence of "unusual circumstances," the agency serves as the finder of fact, and a reviewing court applies the traditional substantial evidence standard. (*Berkley Hillside*,

*supra*, 60 Cal.4th at p. 1114.)  We resolve all evidentiary conflicts and indulge in all reasonable interferences in the agency's favor. (*Ibid*.)

Concerning the "reasonable possibility" part of the exception, the question for the agency and the reviewing court is whether there is substantial evidence to support a  "fair argument" that there is a reasonable possibility the unusual circumstances will produce a significant effect on the environment.  (*Berkley Hillside*, *supra*, 60 Cal.5th at p. 1115.)

There is an alternative test.  Where there is substantial evidence that the Project *will* produce a significant effect on the environment – not simply a reasonable possibility of an effect – both elements of an exemption under Guidelines section 15300.2 have been met.  (*Berkley Hillside*, *supra*, 60 Cal.5th at p. 1105.)

An exemption is created when under ordinary circumstances a qualifying project will not have a significant effect on the environment.  (*Berkley Hillside*, *supra*, 60 Cal.5th at p. 1102.)  Substantial evidence that the Project will have a significant effect on the environment per se shows unusual circumstance.  (*Id*. at p. 1105.)  We apply the deferential substantial evidence standard to the agency's decision in reviewing this alternative.  (*World Business Academy v. State Lands Com*. (2018) 24 Cal.App.5th 476, 499.)

*Unusual Circumstances*

A party may establish unusual circumstances by showing "that the project has some feature that distinguishes it from others in the exempt class, such as its size or location."  (*Berkley Hillside*, *supra*, 60 Cal.5th at p. 1105.)  The Project Opponents fail to make such a showing.

14

The Project Opponents claim that the Project is significantly larger than other projects in its class.  But they cite no such evidence.  In fact, the cases they cite show the opposite.  The Project Opponents cite cases involving ordinances banning plastic bags, where such ordinances were determined to qualify for Classes 7 and 8 exemptions.  (*Save the Plastic Bag Coalition v. City and County of San Francisco* (2013) 222 Cal.App.4th 863; *Save the Plastic Bag Coalition v. County of Marin* (2013) 218 Cal.App.4th 209.)  Those projects covered entire counties.  In addition, the Class 7 exemption gives an example of wildlife preservation activities of the Department of Fish and Game.  Those activities cover the entire state.

The Project Opponents claim that the Project's location distinguishes it from other projects in its exempt class.  They point out that the Project overlays 10,000 acres of classified mineral resources.  But they cite no evidence that other projects in Classes 7 and 8 do not overlay similar resources.  Neither mining nor ordinances that attempt to preserve wildlife are unique to the County.

The Project Opponents compare the Project to the Class 33 exemption.  That exemption is for projects not to exceed five acres to assure the maintenance, restoration, enhancement, or protection of habitat for fish, plants, or wildlife.  (Guidelines, § 15333.)  But the County is not relying on the Class 33 exemption.  It is relying on the Classes 7 and 8 exemptions.  They are separate exemptions and not comparable.

The Project Opponents fail to carry their burden showing unusual circumstances.  We need not determine whether there is substantial evidence to support a fair argument that there is a reasonable possibility unusual circumstances will produce a

significant adverse effect on the environment.  Nevertheless, there is no substantial evidence that would support such a fair argument.

*Fair Argument*

The Project Opponents argue that the Project will have a significant adverse impact because: 1) it is located on land zoned as mineral resource protection and is adjacent to a principal access road to an existing aggregate CUP; and 2) it has the potential to hamper or preclude extraction of or access to aggregate resources.

But nothing in the Project prohibits mining or access to a permitted mine.  The potential for hampering or precluding mining is a proposition based on speculation.  The Project Opponents point to no requirements that could not also have been imposed under the former requirements for a mining CUP.  The former rules governing the operation for a CUP required applicants to show the proposed development will not be obnoxious or harmful; it will not be detrimental to the public interest, health, safety, convenience, or welfare; and that it is consistent with the County's general plan.

The County's general plan provided that applications for resource development shall be reviewed to assure minimal disturbance to the environment and contained a specific policy for the preservation of wildlife migration corridors.  In deciding whether to grant a CUP, and if so on what conditions, the County was required to preserve wildlife migration corridors.

Any one of those provisions would have been sufficient to impose the same or similar restrictions and conditions on mining as may be imposed under the Project.  The Project made explicit what was implicit in the prior law.  That is not close to a fair

argument that there is a reasonable possibility the Project may have an adverse effect on the environment.

It follows that the Project Opponents have failed to show the Project will have an adverse environmental effect.

DISPOSITION

The judgment is affirmed.  Costs are awarded to respondents.

CERTIFIED FOR PUBLICATION.

GILBERT, P. J.

We concur:

YEGAN, J.

BALTODANO, J.

17

Mark S. Borrell, Judge

Superior Court County of Ventura

_____

Jeffer Mangels Butler & Mitchell, Kerry Shapiro and Matthew D. Hinks for Plaintiff and Appellant California Construction and Industrial Materials Association.

Jeffer Mangels Butler & Mitchell, Matthew D. Hinks and Seena M. Samimi for Plaintiff and Appellant Ventura County Coalition of Labor, Agriculture and Business.

Tiffany N. North, County Counsel, Jeffrey E. Barnes, Chief Assistant County Counsel, Franchesca S. Verdin, Assistant County Counsel, for Defendant and Respondent County of Ventura.

University of California, Irvine School of Law Environmental Law Clinic, and Michael Robinson-Dorn for Interveners and Respondents Los Padres ForestWatch et al.